PLANNED PARENTHOOD LEAGUE OF MASSACHUSETTS, INC.
& others[1] *vs.* OPERATION RESCUE & others.[2]

Suffolk. November 9, 1989. - February 22, 1990.

Present: LIACOS, C.J., WILKINS, ABRAMS, O'CONNOR, & GREANEY, JJ.

*Supreme Judicial Court*, Superintendence of inferior courts. *Injunction.*
*Abortion. Practice, Civil*, Appeal, Interlocutory appeal. *Constitutional*
*Law*, Freedom of speech and press.

In the unique circumstances of a civil action in which plaintiffs sought and
were granted injunctive relief in the Superior Court, following which a
single justice of the Appeals Court denied the defendants' petition for
relief pursuant to G. L. c. 231, § 118, first par., and subsequently a
single justice of the Supreme Judicial Court granted the defendants'
further petition for relief under G. L. c. 211, § 3, and suspended the
injunction, the plaintiffs were entitled to review by the Supreme Judi-
cial Court under G. L. c. 211, § 3, where they demonstrated a substan-
tial claim of violation of their substantive rights as well as error that
could not be remedied under the ordinary review process. [706-709]
O'CONNOR, J., dissenting.

Statement of the standards under which this court undertook, pursuant to
G. L. c. 211, § 3, to determine whether a certain preliminary injunction
was properly issued. [709-710]

The record presented to a Superior Court judge by plaintiffs requesting
injunctive relief supported the judge's findings that the plaintiffs had
demonstrated such a risk of irreparable harm and a likelihood of suc-
cess on the merits as entitled the plaintiffs to a preliminary injunction.
[710-714] O'CONNOR, J., dissenting.

---

[1]Preterm, Inc., Repro Associates, Inc., Crittenton Hasting House,
Stanton P. Goldstein, League of Women Voters of Massachusetts,
Massachusetts National Organization for Women, Mass. Choice,
Religious Coalition for Abortion Rights, and Rebecca Roe, a fictitious
name, representing all women who wish to obtain abortions at the plaintiff
clinics.

[2]Pro-Life Action Network of Arlington, Feminists for Life of
Massachusetts, and sixty-nine individual defendants.

An injunction that prohibited defendants from "obstructing" access to certain offices and clinics was not, in the context of the case, unconstitutionally vague. [714-715]

An injunction that required the defendants to refrain from trespassing on, or obstructing access to, offices or clinics of the plaintiffs at which abortion, counseling, and family planning services are provided was not overbroad in violation of the defendants' rights of free expression guaranteed by the First Amendment to the United States Constitution, where the conduct prohibited, although it was expressive, was not protected by the First Amendment. [715-716] O'CONNOR, J., dissenting.

The prospective effect of a preliminary injunction that imposed certain restrictions on certain future expressive conduct was not unlawful prior restraint of the exercise of First Amendment rights, where the limitations placed on the defendants' expressive activities were minimal and where there was a governmental interest, independent of the content of the expression, in preventing illegal activity. [716-717] O'CONNOR, J., dissenting.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on August 11, 1989.

The case was heard by *Nolan*, J., and, on appeal, was consolidated with a separate proceeding before the full court seeking relief under G. L. c. 211, § 3.

*John H. Henn* (*Maria Del Monaco* with him) for the plaintiffs.

*Francis H. Fox* (*Robin A. Driskel & Ann M. Cushing* with him) for the defendants.

*Thomas M. Sobol & Marvin N. Geller*, for American Jewish Congress, amicus curiae, submitted a brief.

*Marjorie Heins & John Reinstein*, for Civil Liberties Union of Massachusetts, amicus curiae, submitted a brief.

*Judith E. Beals, Ruth A. Bourquin & Sarah Wunsch*, Assistant Attorneys General, for the Attorney General, amicus curiae, submitted a brief.

LIACOS, C.J. This case comes to us following an order of a single justice of this court vacating a preliminary injunction issued against the defendants. The injunction required the defendants, various unincorporated associations and individuals, to refrain from trespassing on, or obstructing access to,

offices or clinics of the plaintiffs at which abortion, counseling, and family planning services are provided. For the reasons stated, we order that the injunction be reinstated.[3]

We note the following facts drawn from the record before the motion judge in the Superior Court at the time the injunction was issued. On April 19, 1989, the plaintiffs brought a class action on behalf of themselves and those who might seek to obtain services at the plaintiffs' clinics (clinics). The plaintiffs charged the defendants with eight counts of illegal activity arising out of protests at the clinics, including violations of the Massachusetts Civil Rights Act, intentional infliction of emotional distress, intentional interference with prospective contractual relations, invasion of privacy, false imprisonment, trespass, nuisance, and conspiracy. The plaintiffs' verified complaint sought immediate injunctive relief to "prevent defendants and those acting in concert with them from . . . blockad[ing] family planning clinics in Massachusetts and threaten[ing], intimidat[ing] and coerc[ing] the clinics' patients and staff."

In support of their request for a preliminary injunction, the plaintiffs submitted the affidavits of fourteen eyewitnesses to protests at the clinics, newspaper articles describing these protests, local police arrest records of the days when protests were held, informational literature published by the organizational defendants regarding such protests, and several other documents. The plaintiffs' complaint stated that the purpose of the organizational defendants was to "organize and coordinate blockades and disruptions of abortion and family planning facilities," and alleged that a majority of the individual defendants had been "arrested at least twice in Massachusetts in conjunction with [his or her] anti-abortion blockades and activities." Police records from the Brookline and Worcester police departments showed that all the indi-

---

[3]We acknowledge with appreciation the assistance of amici American Jewish Congress, the Attorney General, and the Civil Liberties Union of Massachusetts.

vidual defendants had been arrested at least twice on dates corresponding to protests held at the clinics.

The protests were described in the affidavits, signed by affiants who claimed to be eyewitnesses to the events described. These affiants stated that the defendants blocked entranceways and lobbies of the clinics by lying on the ground, thereby preventing patients and staff from entering or leaving the clinic. At one protest, one defendant named in the complaint chained herself to a clinic door with a bicycle lock, and, at another protest, one demonstrator chained himself to a toilet in a clinic. Local police attempted to clear the entranceways but were not always successful. As the police moved people away from the entranceways, other protesters would move to fill the vacancy. Protesters who had been removed by the police often would return to their original positions upon their release. The defendants also sang and chanted during the protests and engaged in "sidewalk counseling" in an effort to dissuade people from attempting to enter the clinics. Similar descriptions of protest activity appeared in the newspaper articles submitted by the plaintiffs. One eyewitness stated that she was unable to obtain an abortion on the day for which she had been scheduled, due to the protests.

The organizational defendants' literature refers to the protests as "rescues," which are described as attempts to shut down clinics "by *peacefully*, but *physically* blockading abortion [clinics] with [protesters'] bodies" (emphasis in original). A newsletter published by one organizational defendant provides the following description of a protest at a Massachusetts clinic: "Sending about 75 rescuers as a decoy to [one clinic] . . . , [the protesters] were able to draw the police away from the entrance to [another clinic]. When the entrance was clear, about 40 rescuers who had waited nearby simply walked in and took up their positions. Another 200, including those who had allowed themselves to be dragged from the [first clinic's] entrance, joined the rescue, blocking the outside doors."

In response to the plaintiffs' complaint, thirty-nine of the sixty-nine defendants filed answers prior to the issuance of the injunction. These defendants declined to respond to specific allegations of blocking clinic entranceways or trespassing on clinic property, invoking their rights under the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.[4] Several other defendants filed affidavits in opposition to the motion for injunctive relief. One such affidavit stated that the goal of "Operation Rescue: Boston" was to "stop abortion by nonviolent direct action such as sidewalk counselling, picketing and rescues." Another affidavit, in describing the protests, stated: "We use our bodies in the only way possible in this struggle. We lay upon the ground at which time it is the decision of the authorities to remove us or not by whatever means they chose [*sic*]."

On July 24, 1989, after a hearing and consideration of the arguments of counsel and the affidavits and memoranda filed in the case, the judge granted the plaintiffs' motion for a preliminary injunction.[5] Forty of the sixty-nine defendants petitioned a single justice of the Appeals Court, seeking relief from the injunction pursuant to G. L. c. 231, § 118, first par.

---

[4]The record is unclear as to the exact number of defendants who invoked their Fifth Amendment and art. 12 rights when answering the plaintiffs' complaint. The plaintiffs point to at least thirty-nine defendants who invoked these rights, and the defendants do not contest this allegation.

[5]The preliminary injunction order states:

"After hearing, and after consideration of arguments of counsel and review of the affidavits and memoranda filed, the Court, finding irreparable harm and probability of success on the merits, and balancing the interests involved, hereby *ORDERS* that the above-named defendants, all of whom have been served, and their agents, servants, employees and those acting in concert with them are preliminarily enjoined from:

"a. trespassing on, blocking, or in any way obstructing access (either ingress or egress) to the offices or clinics of plaintiff providers of services, and

"b. physically restraining or obstructing or committing any acts of force or violence against persons entering, leaving, working at or seeking to obtain services from plaintiff providers,

until further order of the Court."

(1988 ed.). A single justice in the Appeals Court denied the petition. These same defendants then brought a petition for relief before a single justice of this court (single justice) under G. L. c. 211, § 3 (1988 ed.). On August 16, 1989, the single justice suspended the preliminary injunction "until the final disposition of this case or until further order of this court." The plaintiffs then moved the single justice to report his decision to the full court. This motion was denied on August 22, 1989. At the time of oral argument before this court, the case had not yet come to trial.

The plaintiffs currently appeal the decision of the single justice to the full court and also directly petition the full court for relief pursuant to G. L. c. 211, § 3. For the purposes of this case, the plaintiffs' appeal and their c. 211, § 3, petition to the full court have been consolidated, and, hence, we treat them as a single action.

1. *Availability of G. L. c. 211, § 3 Review.*

General Laws c. 211, § 3, confers on this court the power of "general superintendence of all courts of inferior jurisdiction to correct and prevent errors and abuses therein if no other remedy is expressly provided." This discretionary power of review has been recognized as "extraordinary," and will be exercised only in "the most exceptional circumstances." *Costarelli* v. *Commonwealth*, 374 Mass. 677, 679 (1978). We will not allow resort to c. 211, § 3, "merely as a substitute for normal appellate review." *Francis* v. *District Attorney for the Plymouth Dist.*, 388 Mass. 1009, 1010 (1983), quoting *Soja* v. *T.P. Sampson Co.*, 373 Mass. 630, 631 (1977). Parties seeking review under c. 211, § 3, must "demonstrate both a substantial claim of violation of [their] substantive rights and error that cannot be remedied under the ordinary review process." *Dunbrack* v. *Commonwealth*, 398 Mass. 502, 504 (1986). *Parents of Two Minors* v. *Bristol Div. of the Juvenile Court Dep't*, 397 Mass. 846, 849 (1986). The plaintiffs' petition to this court satisfies both of the requirements of this exacting test.

First, the plaintiffs allege that the defendants are engaged in a systematic attempt to deprive women of the opportunity

to obtain abortion, counseling, or family planning services. At the very least, the right to choose to terminate a pregnancy by abortion has been recognized as a substantive right under both the Federal and State Constitutions. *Roe* v. *Wade*, 410 U.S. 113 (1973). *Moe* v. *Secretary of Admin. & Fin.*, 382 Mass. 629 (1981).[6] In support of their claims, the plaintiffs have produced voluminous documentary evidence and eyewitness affidavits describing the defendants' obstruction of clinics which provide abortion services, and alleging at least one instance in which a woman could not obtain an abortion due to the defendants' protests. The defendants, in their brief to this court, have made no attempt to deny the specific allegation that they sought, by way of their protests, to obstruct the clinics so that no abortions could be performed. In light of the record below, we conclude that the plaintiffs have demonstrated "a substantial claim of violation of [their] substantive [rights]." *Dunbrack* v. *Commonwealth*, *supra* at 504.

The plaintiffs have also shown that, absent relief under c. 211, § 3, they may suffer an "error that cannot be remedied under the ordinary review process." *Id.* at 504. This requirement derives from that portion of c. 211, § 3, which allows relief only "if no other remedy is expressly provided." This court has repeatedly interpreted this language to require that no other *effective* remedy be available to the petitioners. *Doe* v. *Doe*, 399 Mass. 1006, 1007 (1987). *Parents of Two Minors*, *supra* at 849. *Commonwealth* v. *Dunigan*, 384 Mass. 1, 5 (1981). A party lacks an effective remedy if the available methods of review would be unable to place him in "statu quo." *Elder* v. *Commonwealth*, 385 Mass. 128, 132

---

[6]The defendants' claim that what is at issue in the present case is the plaintiffs' ability to obtain a preliminary injunction. They argue that there is no personal substantive right to obtain an injunction and therefore suggest that the test for c. 211, § 3, review has not been met. This argument ignores the fact that the preliminary injunction in the present case was sought in an attempt to safeguard the right to obtain an abortion, which is a personal substantive right. The defendants do not appear to dispute the plaintiffs' standing to assert such a right.

(1982), quoting *Costarelli, supra* at 680. *Commonwealth* v. *Dunigan, supra* at 5, quoting *Gilday* v. *Commonwealth*, 360 Mass. 170, 171 (1971).

We have allowed review under c. 211, § 3, in cases where alternate appellate procedures were available to the petitioning party. In *Costarelli* v. *Commonwealth, supra*, we used our superintendence powers to review a claim of a violation of the right against double jeopardy, despite the availability of an appeal following a new trial. We noted that "[the] guaranty against being twice exposed to the risk of conviction, regardless of whether conviction actually results, would be seriously weakened if appellate review of a claim of double jeopardy were delayed until after a second trial." *Id.* at 680. See *Elder* v. *Commonwealth, supra* at 132. Similarly, in *Doe* v. *Doe, supra*, we upheld the exercise of c. 211, § 3, review to resolve a child custody dispute, even though there was an alternate appellate remedy available. In reaching our decision, we observed that the alternate appellate process might involve delay, and that "[custodial] [c]ircumstances may change rapidly, and the harm sought to be avoided [by the custody proceeding] may worsen with the passage of time." *Id.* at 1007. We allowed c. 211, § 3, review because the alternate appellate process might not be able to place the petitioning party in statu quo, due to the possible delay. *Id.* See *Parents of Two Minors, supra*; *Custody of a Minor (No. 2)*, 386 Mass. 460 (1982).

These cases illustrate the principle that certain substantive rights may not survive the delays inherent in the normal appellate process. In certain circumstances, the practical effect may be that these rights are lost during the process of appeal and review to which a party ordinarily must turn for protection. The dilemma posed by such a situation presents an appropriate case for c. 211, § 3, review.

In the present case, the plaintiffs retain the obvious option of proceeding to a trial on the merits of their claim for permanent injunctive relief. However, even if the plaintiffs were to be successful at trial, there would be an inevitable delay between the present and the point at which the trial judge

would grant relief from the defendants' alleged obstruction of clinics. For example, the right to obtain an abortion is time-sensitive, and "effectively expires in a matter of weeks from the onset of pregnancy." *Bellotti* v. *Baird*, 443 U.S. 622, 642 (1979). Therefore, the option of a trial on the merits may be insufficient to place in statu quo those women who may be successful in obtaining permanent injunctive relief from the defendants, but whose right to obtain an abortion will be lost due to the passage of time. We conclude that, in the unique circumstances of this case, the plaintiffs are entitled to relief under c. 211, § 3.

The standard for deciding the question whether a preliminary injunction was properly issued, when the question comes before a single justice of this court under G. L. c. 211, § 3, after G. L. c. 231, § 118, first par., consideration by a single justice of the Appeals Court, is the traditional, i.e., *Packaging Indus. Group* v. *Cheney*, 380 Mass. 609 (1980), standard. This is also the standard on review of a trial judge's order by a single justice of the Appeals Court under G. L. c. 231, § 118, and by a three-judge panel of that court on appeal from such a single justice. A litigant should not be permitted to avoid application of the *Packaging Indus. Group* standard by opting to seek relief under G. L. c. 211, § 3, instead of appealing to a panel of the Appeals Court under the second paragraph of § 118 (and seeking a stay pending appeal or an expedited decision). Thus, we apply the same standard in reviewing the decision of the single justice of this court vacating the preliminary injunction.[7]

---

[7]The plaintiffs' petition requests that we review the order of the single justice. Ordinarily, in response to such a petition, "[t]he inquiry of the full court will be whether the single justice has abused his discretion." *Commonwealth* v. *Dunigan*, 384 Mass. 1, 5 (1981). *Commonwealth* v. *Yelle*, 390 Mass. 678, 685, n.5 (1984). To facilitate this determination, this court previously has exercised its power of review under c. 211, § 3, to examine the merits of the case presented to the trial judge. See, e.g., *Parents of Two Minors* v. *Bristol Div. of the Juvenile Court Dep't*, 397 Mass. 846, 851 (1986); *Commonwealth* v. *Dunigan, supra* at 6; *Commonwealth* v. *Cook*, 380 Mass. 314, 321-322 (1980). Accordingly, we turn to the merits of the controversy.

### 2. *The Preliminary Injunction.*

The standard under which a request for a preliminary injunction is considered appears in *Packaging Indus. Group* v. *Cheney*, 380 Mass. 609 (1980). This standard requires that, through "an abbreviated presentation of the facts and the law . . . the moving party must show that, without the requested relief, it may suffer a loss of rights that cannot be vindicated should it prevail after a full hearing on the merits." *Id.* at 616. At the same time, the party opposing the injunction may make a similar showing of irremediable harm which would occur were the injunction to issue. *Id.* The task for the motion judge is to balance the risk of irreparable harm to the plaintiff and defendant "in light of [each] party's chance of success on the merits" at trial. *Id.* at 617. "Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue." *Id.*

The judge in the present case found that the plaintiffs risked irreparable harm and enjoyed a probability of success on the merits. After balancing "the interests involved," the judge granted the plaintiffs' request for a preliminary injunction. As we review these findings, we keep in mind that, "[i]n reviewing the granting . . . of a preliminary injunction, the standard is whether the [trial] court abused its discretion. An appellate court's role is to decide whether the [trial] court applied proper legal standards and whether there was reasonable support for its evaluation of factual questions." *Id.* at 615, quoting *Hochstadt* v. *Worcester Found. for Experimental Biology*, 545 F.2d 222, 229 (1st Cir. 1976). See *Foreign Auto Import, Inc.* v. *Renault Northeast, Inc.*, 367 Mass. 464, 472 (1975). In considering the plaintiffs' c. 211, § 3, petition, we apply the same standard of review.

The plaintiffs requested an injunction in order to protect their right to give and to obtain abortion and family planning services. As we noted earlier, the time-sensitive nature of this right can transform a temporary delay of its exercise into a complete denial of the right. Therefore, the judge's finding that the plaintiffs risked irreparable harm finds strong sup-

port in the record. Regarding the plaintiffs' likelihood of success on the merits, we have already concluded, in our earlier discussion, that the plaintiffs have established a "substantial" claim of a violation of their right to obtain an abortion. While we have no record of what transpired at the hearing on the plaintiffs' motion for a preliminary injunction, the documentary record presented by the plaintiffs is replete with alleged instances of illegal activity on the part of the defendants, including trespass on clinic property and obstruction of clinic entranceways.[8] The plaintiffs presented evidence that the defendants had blockaded their clinics, effectively preventing the provision of abortion and family planning services, and that the defendants routinely ignored police orders to clear the clinics' entrances. The plaintiffs presented eyewitness accounts, newspaper articles, arrest records,[9] and the

---

[8]For example, an eyewitness affiant, Jamie Ann Sabino, identified one defendant, William Cotter, as a leader of a group of protesters who attempted to block the opening of a passageway to a clinic formed by a line of police officers. William Cotter was also identified by eyewitness affiant Leslie Loveless as one of a group of ten protesters who initiated a blockade of a clinic by standing in front of the clinic's entrance. In addition, the answer of another defendant, Harriet Fremont-Smith, admitted that she participated in "sit-ins" at the plaintiffs' clinics, while the affidavit of a third defendant, Constance Smith, the executive director of Operation Rescue: Boston, stated that "[w]e lay upon the ground at which time it is the decision of the authorities to remove us or not by whatever means they chose [*sic*]."

[9]The defendants argue that arrest records are "incompetent" evidence and cannot support a finding of likelihood of success on the merits. This argument fails to appreciate that a hearing on a motion for preliminary injunction is not a trial on the merits, and that we have allowed evidence to be considered in such a hearing even though it might later prove inadmissible at trial. *Brookline* v. *Goldstein*, 388 Mass. 443, 450 n. 10 (1983). The possible inadmissibility of evidence can be taken into account by the judge in according proper weight to the evidence, but does not prevent the judge from considering the evidence. *Id.* at 450. "[I]nasmuch as the grant of a preliminary injunction is discretionary, the trial court should be allowed to give even inadmissible evidence some weight when it is thought appropriate to do so in order to serve the primary purpose of preventing irreparable harm before a trial can be had." 3 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2949, at 471 (1973 ed. & 1989 Supp.). Given the danger of irreparable harm in the present case, the

defendants' own organizational literature in support of their motion.

In response to the plaintiffs' charges, the defendants filed answers to the complaint and affidavits in opposition to the motion for a preliminary injunction.[10] Neither of the affidavits denied the plaintiffs' specific allegations. In fact, one affidavit admitted that "[w]e lay upon the ground at which time it is the decision of the authorities to remove us or not." The answers filed by the defendants denied the paragraphs of the plaintiffs' complaint which contained the eight counts of illegal activity, but did not deny the plaintiffs' specific allegations describing illegal activity occurring during protests at the clinics. Instead, in response to those paragraphs, most of the defendants chose to invoke their right to decline to answer in order to avoid possible self-incrimination.[11] One defendant admitted, in her answer, that she and other protesters had blocked a clinic doorway and had gone limp when police arrived to remove her.

The defendants' answers presented affirmative defenses to the plaintiffs' complaint, but the record reveals no suggestion of any supporting facts presented by the defendants. For example, the defendants did not present any evidence to sug-

judge could properly consider the arrest records, even though they might subsequently prove inadmissible at trial.

[10]In their brief to this court, the defendants claim that the organizational defendants were not properly served prior to the hearing on the plaintiffs' motion for a preliminary injunction. See Mass. R. Civ. P. 23.2, 365 Mass. 769 (1974). We do not address this claim because the defendants specifically waived all issues of service of process and notice during oral argument before this court.

[11]"[A]n adverse inference drawn from the failure of a party to testify [on the ground of self-incrimination] is not sufficient, by itself, to meet an opponent's burden of proof." *Custody of Two Minors*, 396 Mass. 610, 616 (1986). However, if "a case adverse to the interests of the party affected is presented so that failure of a party to testify would be a fair subject of comment," such an inference may be taken into account. *Id.* In the present case, the plaintiffs have presented a sufficient case adverse to the interests of the defendants, through eyewitness affidavits, arrest records, and other documents, to allow the judge to draw an inference from the defendants' invocation of their Fifth Amendment and art. 12 rights.

gest that they were not present at the protests, or that they had been given permission to demonstrate on clinic property. "Evidence that goes beyond the unverified allegations of the pleadings and motion papers must be presented to support or oppose a motion for a preliminary injunction." *Brookline* v. *Goldstein*, 388 Mass. 443, 450 n.10 (1983), quoting 11 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2949, at 469 (1973). Given the plaintiffs' extensive presentation of facts to support their complaint and the defendants' failure affirmatively to oppose those facts, we conclude that the judge acted within her discretion in finding that the plaintiffs enjoyed a likelihood of success on the merits of their complaint.[12]

Furthermore, the defendants failed to demonstrate that they would suffer a risk of irreparable harm if the injunction were issued. While the defendants did present to the judge a defense that their actions described in the complaint were protected by the First Amendment to the United States Constitution, the defendants' concern that an injunction might interfere with their rights under the First Amendment does not by itself constitute a sufficient showing of a risk of irreparable harm for the purposes of a preliminary injunction.

When issuing an injunction, a judge must differentiate between legal and illegal expressive activity, and must carefully tailor the injunction to avoid unconstitutionally infringing on activity protected by the First Amendment. See *NAACP* v. *Claiborne Hardware Co.*, 458 U.S. 886, 907-915 (1982). Clearly, some of the defendants' activities at the protests,

---

[12]The defendants claim that the injunction could not have been issued under the count of the plaintiffs' complaint which alleges a violation of the Massachusetts Civil Rights Act. They argue that, regardless of the likelihood of plaintiffs' success on the merits of their civil rights claim, the injunction does not meet the requirements of G. L. c. 12, § 11J (1988 ed.), for injunctions issued pursuant to civil rights statutes. While this may be true, the record also supports a finding that the plaintiffs enjoy a likelihood of success on the merits of their trespass claim. The trial judge reasonably could have concluded that potential future acts of trespass, resulting in the blockade of clinics, might irreparably harm the plaintiffs and those people they represent in this case.

such as singing and chanting on public sidewalks, are protected, expressive activity. However, for the purposes of demonstrating a risk of irreparable harm, the defendants are not entitled to assume that the judge will issue an injunction which deprives them of their right to free expression. The acceptance of such an assumption would allow a showing of a risk of irreparable harm to be made on no more than a subjective lack of confidence in the abilities of the judge who is to issue the injunction. In light of the extensive record provided by the plaintiffs and the limited response of the defendants, the risk of irreparable harm shown by the plaintiffs and the failure of the defendants to demonstrate a similar risk, we conclude that the judge acted within her discretion in issuing the preliminary injunction.

3. *First Amendment Issues.*

The defendants claim that the injunction is unconstitutionally vague and overbroad, in violation of the First Amendment, and that it constitutes an impermissible prior restraint on their right to freedom of expression guaranteed by the First Amendment. Specifically, the defendants point to that portion of the injunction which prohibits "obstructing" access to the clinics. The defendants contend that an injunction which prohibits "obstruction" could be construed to prohibit constitutionally protected activity as well as illegal activity. We are not persuaded by this argument.

A statute, or injunction, will be considered unconstitutionally vague if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally* v. *General Constr. Co.*, 269 U.S. 385, 391 (1926). The purpose of the vagueness doctrine is to ensure that all "be informed as to what the state commands or forbids." *Smith* v. *Goguen*, 415 U.S. 566, 574 (1974), quoting *Lanzetta* v. *New Jersey*, 306 U.S. 451, 453 (1939). In this manner, people have an opportunity to guide their conduct in conformity with the law, and those entrusted with the enforcement of the laws are provided with strict guidelines for their application. *Grayned* v. *Rockford*, 408 U.S. 104, 108

(1972). The prohibition against overly vague laws protects people from having voluntarily to curtail activities which, although protected by the First Amendment, may be confused with illegal activity due to an unconstitutionally vague statute. *Id.* at 109.

In the present case, we are not persuaded that use of the word "obstructing" strips the injunction of its coherence to persons of common intelligence. The vagueness of a particular statute or injunction should be considered with reference to the factual situation to which it applies. *Id.* at 112. In the context of this injunction, given the history of prior protests, and the pending litigation between the plaintiffs and the defendants, the phrase "obstructing access" can only be construed as referring to the physical blocking of access to the clinics, either by demonstrators sitting or lying in entranceways to prevent patients or staff from entering the clinics, or by the use of inanimate objects to achieve the same purpose. We are in agreement with the United States Court of Appeals for the Ninth Circuit which, when presented with an injunction which prohibited "obstructing the free and direct passage of any person in or out of [a clinic]," held that "[t]he terms of the injunction place the enjoined parties on fair notice of the actions that are prohibited in language that is reasonably understandable." *Portland Feminist Women's Health Center* v. *Advocates for Life, Inc.*, 859 F.2d 681, 684-685 (9th Cir. 1988). The injunction is not unconstitutionally vague.

The injunction also survives the defendants' overbreadth challenge. "A clear and precise enactment may . . . be 'overbroad' if in its reach it prohibits constitutionally protected conduct." *Grayned* v. *Rockford, supra* at 114. The defendants claim that the injunction is overbroad in that it prohibits the privileged exercise of First Amendment rights. However, the injunction does no more than enjoin the defendants from engaging in illegal activity, such as trespass or obstruction of clinic entranceways, in their efforts to have their message heard. The injunction does not prohibit other types of expressive activity, such as praying, singing, or peaceful picketing,

which does not unduly interfere with the rights of others. There is no First Amendment right to "cordon off . . . [an] entrance to a public or private building" in an effort to exercise the right to free expression. *Cox* v. *Louisiana*, 379 U.S. 536, 555 (1965). The right to free speech "[does] not disable the government from taking reasonable steps to ensure that [this right is] not exercised in a manner which infringes on the legitimate rights of other citizens." *Brookline* v. *Goldstein*, 388 Mass. 443, 450 (1983). The injunction prohibits only that conduct which, although expressive, is not protected by the First Amendment. Therefore, it is not overbroad.

Finally, the defendants claim that the injunction constitutes a prior restraint on the free exercise of their First Amendment right to free expression. It is true that the injunction imposes certain restrictions on expressive activities prior to their anticipated occurrence at future protests. However, the prospective nature of the injunction does not render it an impermissible prior restraint. The government may impose reasonable restrictions which have prospective effect on the time, place, and manner of expressive conduct if such regulations can be shown to further a "sufficiently important governmental interest in regulating the [conduct which justifies] incidental limitations on First Amendment freedoms." *Texas* v. *Johnson*, 109 S. Ct. 2533, 2540 (1989), quoting *United States* v. *O'Brien.* 391 U.S. 367, 376 (1968). This "governmental interest" must be "unconnected" to suppression of the content of the expression at issue in order to justify the regulation. *Texas* v. *Johnson, supra* at 2541.

In the present case, we have no doubt that the State's interest in utilizing a preliminary injunction to protect its citizens, residents, and visitors from irreparable harm constitutes a "sufficiently important governmental interest." See *Portland Feminist Women's Health Center* v. *Advocates for Life, Inc., supra* at 686. Also, the injunction is content-neutral, and makes no reference to the specific viewpoints espoused by the defendants or the plaintiffs. The injunction leaves the defendants free to express their views through any

number of alternate methods not prohibited by the injunction, such as singing, lecturing, or peaceful picketing. Clearly, the governmental interest in enforcing the injunction relates to the prevention of illegal activity, and not to "the suppression of [the defendants'] expression." *Texas* v. *Johnson, supra* at 2541. We conclude that the State's interest in imposing the injunction justifies the minimal limitations placed on the defendants' expressive activity.

4. *Conclusion.*

The injunction issued in this case represents a proper exercise of the discretion accorded to judges to provide appropriate interlocutory relief. We concur with the single justice of the Appeals Court that the preliminary injunction is "narrow, carefully tailored, and reasonably specific", and "does not . . . threaten the defendants' First Amendment rights." Accordingly, the suspension of the injunction is vacated, and the injunction is reinstated until the final disposition of this case or until further order of this court.

*So ordered.*

O'CONNOR, J. (dissenting). This case is here on the plaintiffs' petition to the full court under G. L. c. 211, § 3 (1988 ed.), to review an interlocutory order of a single justice of this court issued pursuant to c. 211, § 3. The plaintiffs' petition to the full court is presented along with the plaintiffs' appeal from the single justice's order. The order suspended a preliminary injunction issued against the defendants in the Superior Court.

Because the single justice's order was interlocutory, the plaintiffs, who claim to have been aggrieved, may not as of right obtain immediate appellate review. Indeed, it is well established that ordinarily interlocutory orders will not be reviewed on appeal until the entire case is ripe for review. *Commonwealth* v. *Frado*, 372 Mass. 866 (1977). *Pollack* v. *Kelly*, 372 Mass. 469, 470-471 (1977). *Cappadona* v. *Riverside 400 Function Room, Inc.*, 372 Mass. 167, 169 (1977).

Appellate review of an interlocutory order or ruling is available only "in exceptional circumstances, when necessary to protect substantive rights." *Commonwealth* v. *Frado, supra,* quoting *Healy* v. *First Dist. Court of Bristol,* 367 Mass. 909, 909 (1975). In the past, we have granted appellate review of interlocutory orders of a single justice only on a showing of "both a substantial claim of violation of . . . substantive rights and error that cannot be remedied under the ordinary review process." *DuPont* v. *Superior Court,* 401 Mass. 122, 123 (1987), quoting *Dunbrack* v. *Commonwealth,* 398 Mass. 502, 504 (1986). Whether the full court should now undertake review of the single justice's suspension of the injunction depends on whether (1) the plaintiffs have a substantial claim that the single justice's order constituted error, and (2) that error cannot be remedied in the ordinary course of appellate review following final judgment.

There are nine plaintiffs. Four of them are corporations that provide abortion and other services. One plaintiff is a physician and the medical director of the plaintiff Planned Parenthood. The other four plaintiffs are membership organizations. In addition, the complaint describes as a plaintiff Rebecca Roe, "a fictitious person, who is representative of all the women seeking to obtain an abortion at the plaintiff clinics." The complaint states that "[n]one of the real women scheduled for these services has so far been willing to risk the potential breach of confidentiality attendant upon being a party herein."

In regard to their claims as alleged class representatives, the complaint states that the "plaintiffs bring this action . . . as representative parties on behalf of the following similarly situated classes, each of which classes will be adversely affected by defendants' intended conduct as described below:

"(a) all women who seek abortions or other services of any sort at any clinics or medical offices in Massachusetts;

"(b) all physicians who perform or may perform abortions within Massachusetts;

"(c) all counseling organizations within Massachusetts that provide counseling to women with respect to reproductive matters;

"(d) all clinics within Massachusetts that provide services, including abortion and abortion counseling services, to women."

There is no plaintiff claiming that the defendants have interfered, or threaten to interfere, with her right to an abortion. The plaintiffs are organizations and a male physician. Also, no plaintiff has been certified under Mass. R. Civ. P. 23, 365 Mass. 767 (1974), as a proper representative of women asserting interference with their right to abortion, and it is far from clear that class certification would be appropriate. That is so because it is not clear that any of the plaintiffs properly may be considered to be either a member of a class of women asserting interference with their right to abortion, which would be required under rule 23, or that any plaintiff would qualify under rule 23 as a party who "will fairly and adequately protect the interests of the class." "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members" (citations omitted). *East Tex. Motor Freight* v. *Rodriguez*, 431 U.S. 395, 403 (1977). None of the plaintiffs suffers the same injury as a woman denied an abortion. Furthermore, the plaintiffs assert no other theory on which they may assert the interests of others.

It is my view, then, that in determining whether immediate appellate review of the single justice's interlocutory order should be granted, only the plaintiffs' claims on their own behalf, and not in an asserted representative capacity, should be considered.

I respectfully submit that, in its discussion of the availability of G. L. c. 211, § 3, review, *ante* at 706-707, the court erroneously focuses on the plaintiffs' allegations that "the defendants are engaged in a systematic attempt to deprive women of the opportunity to obtain abortion, counseling, or family planning services" and the like. Instead, the appropriate question is whether the plaintiffs have demonstrated that

the single justice's suspension of the preliminary injunction caused the plaintiffs irremediable harm. *DuPont* v. *Superior Court, supra* at 123. The answer to that question is no; for all that appears, any harm sustained by the plaintiffs in their own right may be remedied by the assessment of damages after a trial. I conclude, therefore, that the plaintiffs' petition to the full court under G. L. c. 211, § 3, should be dismissed without the court reaching the merits of the controversy concerning the single justice's order. Appellate review should be withheld until the case has been tried and final judgment has been entered.

Nevertheless, the court has decided to review the single justice's interlocutory order. Therefore, I turn my attention to the order, and begin by discussing the applicable standard of review. General Laws c. 211, § 3, provides in relevant part: "The supreme judicial court shall have general superintendence of all courts of inferior jurisdiction to correct and prevent errors and abuses therein if no other remedy is expressly provided." The standard by which we review the single justice's action is whether the single justice committed an abuse of discretion or error of law. *Miranda* v. *Commonwealth*, 392 Mass. 420, 422 (1984). *Schipani* v. *Commonwealth*, 382 Mass. 685, 685 (1980). That is the same standard by which the single justice was required by G. L. c. 211, § 3, to review the preliminary injunction issued in the Superior Court. It follows that, if the Superior Court judge was not in error and did not abuse her discretion, the suspension of the preliminary injunction by the single justice constituted error. The single justice did not have discretion to suspend an order properly issued in the Superior Court. On the other hand, if the order in the Superior Court did constitute an abuse of discretion or error of law, the suspension of that order by the single justice was neither erroneous nor an abuse of discretion. Thus, I conclude, as the court has concluded, although perhaps by a different rationale, that the full court's task in reviewing the action taken by the single justice is to decide whether the issuance of the preliminary injunction in the Superior Court constituted error of

law or abuse of discretion. The standard of review is the same as it would be if the case were here for G. L. c. 231, § 118, second par., review.

The injunction provides in material part as follows: "[The court] hereby *ORDERS* that the above-named defendants . . . and their agents, servants, employees and those acting in concert with them are preliminarily enjoined from:

"a. trespassing on, blocking, or in any way obstructing access (either ingress or egress) to the offices or clinics of plaintiff providers of services, and

"b. physically restraining or obstructing or committing any acts of force or violence against persons entering, leaving, working at or seeking to obtain services from plaintiff providers, until further order of the Court."

It is appropriate at the outset to consider how the injunction may reasonably be construed. The court says, *ante* at 715, that "the phrase [in the injunction] 'obstructing access' can only be construed as referring to the physical blocking of access to the clinics, either by demonstrators sitting or lying in entranceways to prevent patients or staff from entering the clinics, or by the use of inanimate objects to achieve the same purpose." In my view, the court's construction of the injunction as limited to on-site physical blocking of entranceways to clinics is much too narrow. The injunction bars "trespassing on, blocking, or in any way obstructing access (either ingress or egress)." Surely, reasonable persons, wishing to express their views about the morality of abortion and whether abortion should be legal, could not be confident that they would not violate that injunction by joining others on public ways adjacent to a clinic to picket, pray, chant, and exhort others to accept their viewpoint. The injunction expressly forbids not only trespassing and blocking, but also "obstructing" ingress or egress in any way. It cannot reasonably be said that the prohibition against obstruction adds nothing to the prohibition against trespassing and blocking. Such a result can be reached only by reading words out of the injunction. The injunction must fairly be construed as prohibiting the hindrance of access to clinics by nonphysical

confrontation on public ways as well as the physical blockading of entranceways. It is worth noting that Webster's Third New Int'l Dictionary (1961) gives as one of several definitions of the word "obstruct" the following: "to be or come in the way of: hinder from passing, action, or operation: impede; retard (unwise rules [obstruct] legislation) (constant interruptions [obstruct] our progress)." That definition clearly includes hindrance of access by other than physical means.

The court states, *ante* at 715, its "agreement with the United States Court of Appeals for the Ninth Circuit which, when presented with an injunction which prohibited 'obstructing the free and direct passage of any person in or out of [a clinic],' held that '[t]he terms of the injunction place the enjoined parties on fair notice of the actions that are prohibited in language that is reasonably understandable.' *Portland Feminist Women's Health Center* v. *Advocates for Life, Inc.*, 859 F.2d 681, 684-685 (9th Cir. 1988)." I have two comments: (1) The language of the injunction issued in *Portland Feminist Women's Health Center* did not expressly prohibit "trespassing on, blocking, or in any way obstructing access" and therefore it does not suggest, as the language in this injunction does, that the prohibition against obstructing was intended to reach beyond trespassing and blocking. (2) The defendants against whom the injunction was issued in *Portland Feminist Women's Health Center* did "not challenge the first paragraph of the preliminary injunction, prohibiting obstruction of access to the clinic." *Id.* at 686. Thus, there is no interpretation by the Court of Appeals with which this court can agree or disagree.

*Commonwealth* v. *Oakes*, 401 Mass. 602 (1988), vacated as moot, 109 S. Ct. 2633 (1989) (plurality opinion), involved the constitutionality of the Massachusetts child pornography statute, G. L. c. 272, § 29A (1986 ed.), prior to its most recent amendment in 1988. That statute prohibited knowingly permitting a child under eighteen years of age "to pose or be exhibited in a state of nudity . . . for purpose of visual representation or reproduction in any book, magazine, pam-

phlet, motion picture film, photograph or picture." Despite the obvious legislative intent to criminalize only child pornography, the court construed the statute literally as "mak[ing] a criminal of a parent who takes a frontal view picture of his or her naked one year old running on a beach or romping in a wading pool," and then declared the statute to be overbroad and unconstitutional. *Id.* at 605. Surely, if it was appropriate to construe G. L. c. 272, § 29A, as including a criminal prohibition against a parent photographing his or her naked one year old child romping on the beach, the preliminary injunction in this case must be construed, or reasonably may be construed, as prohibiting conduct protected by the First Amendment to the United States Constitution. I submit, therefore, that the preliminary injunction was overly broad, and for that reason alone was erroneously granted. The single justice correctly suspended it.

There are numerous other reasons requiring the conclusion that the preliminary injunction was erroneously issued. It is true, as the court states, *ante* at 710, that "[t]he standard under which a request for a preliminary injunction is considered appears in *Packaging Indus. Group* v. *Cheney*, 380 Mass. 609 (1980)." I conclude that, measured by that standard, and particularly keeping in mind that the injunction in this case restrains speech, the injunction should not have been granted. My approach, however, is not to proceed through the several-step *Packaging Indus. Group* analysis but rather simply to consider whether the injunction is constitutionally infirm. If the injunction is constitutionally infirm, it necessarily follows that the *Packaging Indus. Group* standard has not been met.

With respect to whether the injunction offends the defendants' First Amendment rights of free speech for reasons in addition to overbreadth, discussed above, the case of *NAACP* v. *Claiborne Hardware Co.*, 458 U.S. 886 (1982), is instructive. That case involved a boycott of white merchants by members and supporters of the National Association for the Advancement of Colored People (NAACP). The purpose of the boycott was to secure compliance by both civic and busi-

ness leaders with numerous demands for equality and racial justice. The boycott was largely supported by speeches, but there were sporadic acts of violence. The merchants filed an action in the Mississippi Chancery Court for injunctive relief and damages against the NAACP, another organization, and 146 individual defendants. After an evidentiary hearing and fact finding, the Chancery Court imposed damages on 130 defendants, subsequently the petitioners in the United States Supreme Court (petitioners), on several theories. The Chancery Court also issued a permanent injunction enjoining the petitioners "from stationing 'store watchers' at the [merchants'] business premises; from 'persuading' any person to withhold his patronage from [the merchants]; from 'using demeaning and obscene language to or about any person' because that person continued to patronize the [merchants]; from 'picketing or patroling' the premises of any of the [merchants]; and from using any violence against any person or inflicting damage to any real or personal property." *Id.* at 893.[1]

The Supreme Court of Mississippi upheld "the imposition of liability" on most of the petitioners on the common law tort theory of malicious interference with the merchants' (respondents') business. *Id.* at 894. Based on the Chancery Court's findings that fear of reprisals by the petitioners caused some black citizens to withhold their patronage from the respondents' businesses, the Supreme Court of Mississippi held that the entire boycott was unlawful, and affirmed the petitioners' liability for all damages "resulting from the boycott" on the ground that the "petitioners had *agreed* to

---

[1] "Store watchers" were individuals who "stood outside of boycotted stores and identified those who traded with the merchants. Some of these 'store watchers' were members of a group known as the 'Black Hats' or the 'Deacons.' The names of persons who violated the boycott were read at meetings of the Claiborne County NAACP and published in a mimeographed paper entitled the 'Black Times.' As stated by [the Chancery Court], those persons 'were branded as traitors to the black cause, called demeaning names, and socially ostracized for merely trading with whites.'" *NAACP* v. *Claiborne Hardware Co.*, 458 U.S. 886, 903-904 (1982).

use force, violence, and threats to effectuate the boycott" (emphasis in original). *Id.* at 895. The court let the injunction stand. *Id.* at 896 n.18.

The United States Supreme Court reversed the Supreme Court of Mississippi and remanded the case for further proceedings. *Id.* at 934. In several respects the Supreme Court's action and reasoning bear on the present case.

In *NAACP, supra*, the Supreme Court held that "nonviolent elements of petitioners' activities [were] entitled to the protection of the First Amendment." *Id.* at 915. The Court then considered "the effect of [its] holding that much of petitioners' conduct was constitutionally protected on the ability of the State to impose liability for elements of the boycott that were not so protected." The parallel between that case and the present one is apparent. The Court observed: "No federal rule of law restricts a State from imposing tort liability for business losses that are caused by violence [query, trespass, as here] and by threats of violence. When such conduct occurs in the context of constitutionally protected activity [as here], however, 'precision of regulation' is demanded. *NAACP v. Button*, 371 U.S. 415, 438 [1962]. Specifically, the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages." *Id.* at 916-917.

"The First Amendment . . . restricts the ability of the State to impose liability on an individual solely because of his association with another. In *Scales v. United States*, 367 U.S. 203, 229 [1961], the Court noted that a 'blanket prohibition of association with a group having both legal and illegal aims' would present 'a real danger that legitimate political expression or association would be impaired.' The Court suggested that to punish association with such a group, there must be 'clear proof that a defendant "specifically intend[s] to accomplish [the aims of the organization] by resort to violence."' *Ibid.* (quoting *Noto v. United States*, 367 U.S. 290, 299 [1961]). Moreover, in *Noto v. United States*, the Court emphasized that the intent must be judged 'according to the

strictest law' for 'otherwise there is a danger that one in sympathy with the legitimate aims of such an organization, but not specifically intending to accomplish them by resort to violence [here, trespass], might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share.' *Id.* at 299-300." (Footnotes omitted.) *NAACP* v. *Claiborne Hardware Co., supra* at 918-919.

In *NAACP, supra,* the Court concluded that the Supreme Court of Mississippi had "relied on isolated acts of violence during a limited period to uphold respondents' recovery of *all* business losses sustained over a 7-year span" (emphasis in original). *Id.* at 924. "No losses," said the Court, "are attributed to the voluntary participation of individuals determined to 'secure justice and equal opportunity.' The court's judgment 'screens reality' and cannot stand." (Footnotes omitted.) *Id.* "For the same reasons," said the Court, "the permanent injunction entered by the chancellor must be dissolved. Since the boycott apparently has ended, the Mississippi Supreme Court may wish to vacate the entire injunction on the ground that it is no longer necessary; alternatively, the injunction must be modified to restrain only unlawful conduct and *the persons responsible for conduct of that character*" (emphasis added). *Id.* at 924 n.67.

In its summation, the Supreme Court in *NAACP, supra* at 933-934, made clear that the imposition of liability in a case such as the present one "must be supported by findings that adequately disclose the evidentiary basis for concluding that specific parties agreed to use [or used] unlawful means, that carefully identify the impact of such unlawful conduct, and that recognize the importance of avoiding the imposition of punishment for constitutionally protected activity."

Before applying the principles enunciated in *NAACP* to the case at bar, in recognition of the fact that here the court is not dealing with the imposition of liability for damages but rather with the issuance of a preliminary injunction, I quote from Justice Brennan's concurring opinion in *Nebraska Press Ass'n* v. *Stuart,* 427 U.S. 539, 588-589 (1976): " '[I]t

has been generally, if not universally, considered that it is the chief purpose of the [First Amendment's] guaranty to prevent previous restraints upon publication.' *Near* v. *Minnesota ex rel. Olson*, 283 U.S. [697,] 713 [1931]. See also, e.g., id. at 716-717; *Patterson* v. *Colorado ex rel. Attorney General*, 205 U.S. 454, 462 (1907); *Grosjean* v. *American Press Co.*, 297 U.S. 233, 249 (1936). Prior restraints are 'the essence of censorship,' *Near* v. *Minnesota ex rel. Olson, supra* at 713, and '[o]ur distaste for censorship — reflecting the natural distaste of a free people — is deep-written in our law.' *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U.S. 546, 553 (1975). The First Amendment thus accords greater protection against prior restraints than it does for subsequent punishment for a particular speech, see, e.g., *Carroll* v. *Princess Anne*, 393 U.S. 175, 180-181 (1968); *Near* v. *Minnesota ex rel. Olson, supra*; 'a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. . . .' *Southeastern Promotions, Ltd.* v. *Conrad, supra*, at 559." (Emphasis in original.)

I turn now to the preliminary injunction that was issued in this case. In denying a petition to report his order suspending the preliminary injunction, the single justice noted that the record "contains only pleadings, affidavits, and memoranda of law. There has been no evidentiary hearing at which testimony has been taken. Though the judge's order indicates that she considered the affidavits and arguments of counsel, there are no findings of fact in the record. The case should be tried in the Superior Court; findings of fact should be made and an appellate record should be prepared." The preliminary injunction is unlawful not only because of its overbreadth, but also, as the single justice observed, because it was issued without express findings based on adequate evidence as required by *NAACP* v. *Claiborne Hardware Co.*, *supra* at 933-934. In a case implicating First Amendment guarantees, as this one does, affidavits are an inadequate substitute for live testimony in an adversary proceeding followed by findings of fact. This court's reinstatement of the prelimi-

nary injunction takes First Amendment protection far too lightly.

The court states as follows: "In support of their claims, the plaintiffs have produced voluminous documentary evidence and eyewitness affidavits describing the defendants' obstruction of clinics which provide abortion services, and alleging at least one instance in which a woman could not obtain an abortion due to the defendants' protests. The defendants, in their brief to this court, have made no attempt to deny the specific allegation that they sought, by way of their protests, to obstruct the clinics so that no abortions could be performed. In light of the record below, we conclude that the plaintiffs have demonstrated 'a substantial claim of violation of [their] substantive [rights].' " *Ante* at 707. Elsewhere, the court states: "While we have no record of what transpired at the hearing on the plaintiffs' motion for a preliminary injunction, the documentary record presented by the plaintiffs is replete with alleged instances of illegal activity on the part of the defendants, including trespass on clinic property and obstruction of clinic entranceways. The plaintiffs presented evidence that the defendants had blockaded their clinics, effectively preventing the provision of abortion and family planning services, and that the defendants routinely ignored police orders to clear the clinics' entrances. The plaintiffs presented eyewitness accounts, newspaper articles, arrest records, and the defendants' own organizational literature in support of their motion." (Footnotes omitted.) *Ante* at 711-712. Finally, the court states that, "[g]iven the plaintiffs' extensive presentation of facts to support their complaint and the defendants' failure affirmatively to oppose those facts, we conclude that the judge acted within her discretion in finding that the plaintiffs enjoyed a likelihood of success on the merits of their complaint" (footnote omitted). *Ante* at 713.

Unfortunately, I disagree not only with the court's characterization of the plaintiffs' proof as "voluminous," "extensive," and as demonstrating a likelihood of success on the merits after trial, but also with the court's factual statements that the plaintiffs produced "eyewitness affidavits describing

*the defendants'* obstruction of clinics," that an affidavit alleged "one instance in which a woman could not obtain an abortion due to *the defendants'* protests," that "the documentary record . . . is replete with alleged instances of illegal activity *on the part of the defendants,*" and that "the *defendants* routinely ignored police orders to clear the clinics' entrances" (emphasis added).

There were no such affidavits. No affiant claims to have seen and identified any individual defendant trespassing on clinic property, blocking the entrance of any clinic, engaging in illegal activity, or ignoring police orders to clear clinic entrances.[2] Several affidavits describe conduct of "the Opera-

---

[2]The plaintiffs submitted fifteen affidavits in the Superior Court in support of their application for a preliminary injunction. On appeal, the court has chosen just two of those affidavits to exemplify "the documentary record presented by the plaintiffs," which record the court characterizes as "replete with [eyewitness accounts of] alleged instances of illegal activity on the part of the defendants, including trespass on clinic property and obstruction of clinic entranceways." *Ante* at 711. One of the chosen affidavits is that of Jamie Ann Sabino. Sabino states in relevant part that on October 22, 1988, she went to the offices of Gynecare, 177 Tremont Street, Boston, "a clinic which provides gynecological care and abortion services." I pause to note that nothing in the record suggests that any of the plaintiffs operates that clinic. The affidavit goes on to state that, at that time and place, Sabino "had the opportunity to observe the protests by the group calling itself Operation Rescue," that "there were approximately 125 persons present from Operation Rescue," and that "[t]hey completely blocked the sidewalk in front of the clinic and spilled into the street." The affidavit further states that the police formed a very narrow passage into the clinic, that "many Operation Rescue protesters [had] to be removed from blocking the passage," and that, "once moved, [they] would come back and have to be moved away again." According to the affidavit, Sabino "recognized two of the persons acting as leaders," one of whom was William Cotter. William Cotter is a defendant.

When the injunction was issued, there were sixty-nine defendants in this case. The Sabino affidavit identifies only one of them, Cotter, and alleges only that Cotter was a leader of a protest at premises not shown to have been affiliated with any plaintiff, and that some protesters, not identified as defendants, interfered with the passageway formed by the police on property which, for all that appears, was public.

The other affidavit chosen by the court to exemplify the documentary record presented by the plaintiffs is that of Leslie Loveless. Loveless is described in the affidavit as "Public Affairs Coordinator at Planned Parenthood League of Massachusetts." The affidavit states in material

tion Rescue people," the "protestors," and the "demonstra-

part that on March 4, 1989, Loveless arrived at Planned Parenthood's Brookline clinic in the early morning. According to the affidavit, "[a]t approximately 8:00 a.m., a group of about ten Operation Rescue protesters drove up to Planned Parenthood's clinic, parked their cars, and stood in front of the clinic entrance. Among these ten people were two persons [Loveless] recognized as Operation Rescue organizers. One of them was William Cotter, who is a defendant in this lawsuit. William Cotter and the others were joined by ten to twenty other Operation Rescue protesters a short time later. Some protesters linked arms and strode up the walkway to the clinic, while others dropped to the ground and crawled toward the steps. At this time there were approximately thirty protesters in all."

The Loveless affidavit, like the Sabino affidavit, identifies only one defendant, Cotter. Furthermore, the statement that "some protesters strode up the walkway" while "others crawled toward the steps" does not establish that any defendant, even Cotter, engaged in that activity.

The court also points to defendant Harriet Fremont-Smith's answer to the plaintiffs' complaint. *Ante* at 711 n.8. In their complaint, at paragraph 97, the plaintiffs allege as follows: "[A]ccording to defendants' own literature, [the defendants' purpose] is to close down abortion clinics and prevent employees or pregnant women from entering them. The means used to achieve these ends include trespassing on, sitting in, or blocking access to such facilities; chaining themselves to equipment and furniture; threatening, intimidating and coercing patients and visitors; staging disruptive protests; and otherwise disrupting and interfering with the operations of such facilities." Fremont-Smith answered those allegations as follows: "Defendant admits that defendant's purpose is to dissuade women from obtaining abortions. Defendant admits that she participated in sit-ins, and that she has staged protests at such facilities. Defendant denies each and every remaining allegation of paragraph 97."

Of course, Fremont-Smith's admissions in her pleading are not binding on any other defendant. Moreover, the answer does not even mention any other defendant. Furthermore, the quoted answer does not admit that Fremont-Smith herself trespassed or engaged in other unlawful conduct on the plaintiffs' property.

Finally, the court refers to an affidavit of defendant Constance Smith. *Ante* at 711 n.8. In her affidavit, Smith states that she is executive director of "Operation Rescue: Boston." "We use our bodies," she states, "in the only way possible in this struggle. We lay upon the ground at which time it is the decision of the authorities to remove us or not by whatever means they chose [*sic*]. We are absolutely opposed to violence. Violence begets violence."

Smith's affidavit says nothing about whether the defendants lay upon the plaintiffs' property. Furthermore, even if Smith's affidavit should be construed to mean that Operation Rescue: Boston's policy is to trespass, the law is clear, as I have stated in the text of this dissent, that a defendant's mere association with that organization is not enough to justify the imposition of liabiity on that defendant. All the more, mere association

tors," but such characterizations do not equate with identification of defendants. Those affidavits, even if believed in their entirety, provide no basis for an inference that the individual defendants personally engaged in any activity not protected by the First Amendment and, as *NAACP* v. *Claiborne Hardware Co.*, *supra*, makes clear, the First Amendment does not permit a State to impose liability on an individual solely because of his or her association with others whose conduct may give rise to those persons' liability.[3]

In addition to the "eyewitness accounts" said to have been presented by the plaintiffs by way of affidavits, the court relies on "newspaper articles, arrest records, and the defendants' own organizational literature." I briefly discuss those in turn. Surely, newspaper reports, based, as they may be, on several layers of hearsay, and subject to bias on the part of both reporters and informants, cannot properly be deemed sufficiently reliable to be given a role in determining whether an order restraining freedom of expression may properly be issued. The same is true with respect to arrest records. No such record in this case even suggests that any defendant was arrested on a charge of trespassing or for blocking clinic doors. It is noteworthy that the record fails to disclose that any arrested defendant has ever been convicted of any crime or even been indicted or charged by criminal complaint.

In *Commonwealth* v. *Rojas*, 403 Mass. 483 (1988), the court was required to decide whether evidence of drugs and drug paraphernalia had properly been seized from the defendant's apartment pursuant to a search warrant. The warrant had been issued on the basis of an affidavit containing information disclosed by an unidentified informant. A crucial

would not justify a prior restraint of speech against the numerous defendants in this case.

I repeat what I have said in the text: the plaintiffs produced no eyewitness affidavits describing the defendants' obstruction of clinics, unlawful activity, or disregard of police orders to clear clinic entrances.

[3]The three organizational defendants in this case are unincorporated associations. Therefore, they are not subject to suit except under Mass. R. Civ. P. 23.2, 365 Mass. 769 (1974). The plaintiffs have not invoked that rule.

question was whether the informant's reliability had been established by a statement in the affidavit that the informant had previously given information leading to the arrest of a third person. The court held: "A naked assertion that in the past the informant had provided information which led to a prior arrest is insufficient by itself to establish an informant's veracity. . . . The affidavit does not . . . indicate whether any information previously provided to the police by him had been proven correct." *Id.* at 486. The message of *Rojas* is that, for Fourth Amendment purposes, an arrest is not a reliable indication that the person arrested committed the offense for which he or she was arrested. It is a remarkable turnabout for the court, slightly more than one year after deciding *Rojas*, to conclude that, for purposes of issuing an order restraining free speech and association, protected by the First Amendment, arrests are indeed reliable indicators of the arrestees' conduct.

The court finds support for the injunction in "the defendants' own organizational literature." *Ante* at 712. The organizational literature does not warrant an inference as to any individual defendant that he or she subscribes to or supports, let alone has engaged in or intends to engage in, unlawful activity. "The First Amendment . . . restricts the ability of the State to impose liability on an individual solely because of his association with another. . . . [I]n *Noto* v. *United States*, the Court emphasized that this intent [to accomplish the aims of an organization to which one belongs by resort to unlawful conduct] must be judged 'according to the strictest law' for 'otherwise there is a danger that one in sympathy with the legitimate aims of such an organization, but not specifically intending to accomplish them by resort to [unlawful conduct], might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share.' " (Footnotes omitted.) *NAACP* v. *Claiborne Hardware Co.*, *supra* at 918-919.

The court points out that, in response to certain allegations in the plaintiffs' complaint, most of the defendants chose to

invoke their right to decline to answer in order to avoid possible incrimination. *Ante* at 712. Then the court, *ante* at 712 n.11, quoting from *Custody of Two Minors*, 396 Mass. 610, 616 (1986), says that "if 'a case adverse to the interests of the party affected is presented so that failure of a party to testify would be a fair subject of comment,' such an inference may be taken into account. . . . In the present case, the plaintiffs have presented a sufficient case adverse to the interests of the defendants, through eyewitness affidavits, arrest records, and other documents, to allow the judge to draw an inference from the defendants' invocation of their Fifth Amendment and art. 12 rights." The court's reasoning is wrong in several respects. No case holds that the invocation of the Fifth Amendment or art. 12 by one or more defendants permits an adverse inference to be drawn against codefendants. Also, the defendants in this case who pleaded the Fifth Amendment or art. 12 did so before, not after, the plaintiffs presented their case through affidavits, arrest records, and other documents. Furthermore, the rule to which the court refers relates to a failure to respond to evidence, and not, as here, a failure to respond to pleadings. Lastly, the rule only means that there is no constitutional obstacle to the drawing of logical inferences in a civil case from a party's failure to testify on Fifth Amendment and art. 12 grounds. Surely, a defendant's refusal to answer allegations in a complaint because his or her answer might somehow be used against him or her in a criminal case does not logically permit an inference that that defendant trespassed on the plaintiffs' property or blockaded a doorway. In any event, as the court notes, *ante* at 712 n.11, " '[A]n adverse inference drawn from the failure of a party to testify [answer?] (on the ground of self-incrimination) is not sufficient, by itself, to meet an opponent's burden of proof.' *Custody of Two Minors*, 396 Mass. 610, 616 (1986)." Here, the Fifth Amendment and art. 12 pleas by some defendants do indeed stand by themselves.

In summary, none of the plaintiffs is a woman claiming past interference or threatened future interference with her

access to abortion. None of the plaintiffs has been certified as a representative of such a woman, and the propriety of such a certification is highly questionable. The plaintiffs assert no other theory on which they may assert the rights of others. Therefore, in deciding whether to grant immediate appellate review, the court should consider only the plaintiffs' claims on their own behalf. As to those claims, even if the single justice were in error, no irreparable harm has been shown. Money damages would provide an adequate remedy. Therefore, the plaintiffs' petitions under G. L. c. 211, § 3, should be dismissed, and appellate review should be withheld until the case is tried and judgment is rendered.

I agree with the court that, if appellate review is granted, the court's task is to decide whether the preliminary injunction was properly granted in the Superior Court. That order, fairly construed, prohibits any hindrance of access to and from the plaintiffs' clinics whether accomplished by physical or nonphysical means and whether the defendants' conduct takes place on or off the plaintiffs' premises. So construed, the injunction is constitutionally overbroad and unlawful for that reason alone. It is also unlawful because it was issued without express findings of fact based on adequate evidence. The affidavits submitted by the plaintiffs, together with arrest records, newspaper clippings, organizational literature, and some defendants' refusal to answer some paragraphs of the plaintiffs' complaint on Fifth Amendment and art. 12 grounds, do not begin to prove, and do not demonstrate a likelihood that the plaintiffs will ever be able to prove, the defendants' liability even for damages, much less the plaintiffs' entitlement to an imposition on the defendants of a far more onerous prior restraint of their freedom of speech and association. In my view, the court's reinstatement of the injunction after the single justice properly suspended it is inconsistent with First Amendment values. "A free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand." *Nebraska Press Ass'n* v. *Stuart*, 427 U.S. 539, 588-

589 (1976) (Brennan, J., concurring), quoting *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U.S. 546, 553 (1975).[4,5]

I respectfully dissent.

---

[4]The plaintiffs assert that the single justice erred in suspending the injunction as to several original defendants who did not join in the G. L. c. 211, § 3, petition to the single justice. It is true, of course, that, if the single justice had not suspended the injunction, the defendants who did not petition for its suspension would have no right of review. It does not follow, however, that, with the propriety of the injunction before him, the single justice was without authority to suspend it as to all the defendants if it was erroneously issued, as I believe it was. An appellate court may reverse a judgment in favor of parties that do not appeal. *Professional Economics, Inc.* v. *Professional Economic Servs., Inc.*, 12 Mass. App. Ct. 70, 70 n.1 (1981), and cases cited.

[5]Even if there were plaintiffs in this case alleging interference with their abortion rights, and even if, after an evidentiary hearing, the defendants had been properly found to have personally blockaded doorways in a non-violent manner, the decisions of the United States Supreme Court leave it far from clear that prior restraint of such expressive conduct would be compatible with the First Amendment. That issue is not presented by this case.