PLANNED PARENTHOOD LEAGUE OF MASSACHUSETTS, INC. *vs.*
BARBARA BELL.

Middlesex. November 5, 1996. - March 18, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, O'CONNOR, GREANEY, FRIED, &
MARSHALL, JJ.

*Practice, Civil,* Standing, Preliminary injunction. *Nuisance. Abortion.*
*Constitutional Law,* Abortion, Freedom of speech and press. *Injunction.*

A private clinic had standing as a representative of its patients to seek a
court order enjoining the conduct of another constituting a public
nuisance that interfered with the rights of the clinic's patients to obtain
an abortion. [577-579]

In an action seeking injunctive relief from an alleged public nuisance, the
judge correctly concluded that the defendant's conduct created an ac-
tionable nuisance and the judge's findings, in issuing the injunction, sup-
ported the conclusion that the defendant's activities in the vicinity of an
abortion clinic, viz., representing herself as an agent of the clinic in
violation of a prior court order, shouting loudly outside the clinic, and
blocking patients attempting to enter the clinic in violation of another
court order, did not constitute speech protected by the First Amend-
ment to the United States Constitution and art. 16 of the Massachusetts
Declaration of Rights. [579-583]

An injunction directed toward one person, prohibiting her from entering
within fifty feet of an abortion clinic in order to ensure public safety and
order, to protect patients' freedom to seek lawful medical services, to
protect the physical and psychological well-being of the clinic's patients
and to maintain the integrity of prior court orders, did not burden the
defendant's speech more than necessary to serve the significant public
interests at stake. [583-585]

CIVIL ACTION commenced in the Superior Court Depart-
ment on October 21, 1994.

The case was heard by *Margaret R. Hinkle,* J., and a mo-
tion for reconsideration was heard by her.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Dwight G. Duncan* (*Luke Stanton* with him) for the defen-
dant.

*Teresa A. Martland* (*Audrey C. Mark* with her) for the plaintiff.

*Freda K. Fishman*, Assistant Attorney General, for the Attorney General, amicus curiae, submitted a brief.

ABRAMS, J. The defendant, Barbara Bell, appeals from the imposition of a preliminary injunction prohibiting her from entering within fifty feet of a Brookline clinic operated by Planned Parenthood League of Massachusetts, Inc. (PPLM).[1] A Superior Court judge issued the injunction after conducting two days of evidentiary hearings and concluding that Bell had "knowingly, intentionally and willfully crossed the boundary from conduct protected by the First Amendment to prohibited conduct."

On appeal, Bell argues that the injunction should be vacated because it impermissibly infringes on her rights under the First Amendment to the United States Constitution and art. 16 of the Massachusetts Declaration of Rights. Bell further argues that the injunction is unconstitutionally overbroad because it burdens more speech than necessary to accomplish a significant government interest. The Superior Court judge denied Bell's motion for reconsideration or, in the alternative, her motion for stay pending appeal. A single justice of the Appeals Court denied Bell's petition for temporary relief pending appeal, holding that the injunction burdens no more speech than necessary to serve the significant government interest of "protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy." We transferred the appeal to this court on our own motion. We affirm.

PPLM is a nonprofit corporation that operates a clinic in Brookline which provides family planning services, including abortion. In October, 1994, on behalf of itself and its patients, PPLM brought this action seeking injunctive relief against Bell based on common law public nuisance grounds. Bell al-

[1]The preliminary injunction states in pertinent part: "The Court, finding irreparable harm and probability of success on the merits, and balancing the interests involved, hereby ORDERS that defendant Barbara Bell is preliminarily ENJOINED from entering within 50 feet in front of, or to the right or the left of, the property line of the Planned Parenthood Clinic located at 1031-1033 Beacon Street, Brookline, Massachusetts, during the hours of Clinic operation, until further order of the Court. This injunction is not intended to include any private property except that owned or leased by the Clinic."

ready was subject to two permanent injunctions prohibiting her from engaging in certain conduct outside the clinic. On October 17, 1991, she was enjoined from representing herself in any way as an affiliate of the clinic, including wearing a pinney (apron) such as those worn by clinic escorts. See note 8, *infra*. On October 28, 1991, she was enjoined from trespassing on, blocking, or obstructing access to any facility in the Commonwealth providing abortion services; and from restraining, obstructing, or committing any acts of force against any persons entering or leaving any such facility. Also, a January, 1991, stipulation and order bars her from using any sound amplification device to project any noise, including her own voice, such that it is audible inside the clinic.

PPLM argued that the injunctive relief was necessary because Bell persistently engaged in the following activity: (1) she wore a pinney falsely representing herself as an agent of the clinic in violation of the first court order; (2) she shouted loudly outside the clinic such that her voice could be clearly heard inside the clinic; and (3) she harassed and intimidated patients who attempted to enter the clinic by crowding them and blocking their way.

The judge found that Bell regularly rushed up to patients and the persons accompanying them, making uninvited contact and following them as they crossed the trolley tracks and Beacon Street to reach the clinic. Bell also rushed up to cars as drivers attempted to park and drop off patients. She confronted patients by walking in front of or in close proximity to them, steadily shouting statements such as "no mother is ever the same after her baby's been ripped out of her womb."

Patients reacted to Bell by turning away from the clinic, raising an outstretched hand to ward off her advances, and by running away from her. Nonetheless, Bell would persist. The judge found that, while other clinic protestors "often stand beside and behind patients, [Bell] alone stands in front of patients, on occasion blocking them."

When scheduling appointments, the clinic's staff instruct patients to look for clinic escorts if they need assistance entering the clinic. The judge found that Bell continued to wear pinneys closely resembling those worn by the escort staff, in violation of the permanent injunction issued against her on

October 17, 1991. On one occasion, Bell started the morning wearing a pinney of the same color as the escorts' pinneys, and when the escorts changed to pinneys of a different color, Bell did the same. Although Bell's pinneys bore different lettering, the judge found that the resemblance to escort pinneys was so strong that some patients approaching the clinic became confused as to which persons were the true clinic escorts.[2]

Bell frequently stood approximately ten feet from the clinic, shouting to the patients seated in the waiting room inside the clinic. The clinic staff would turn on music and the air conditioner in an attempt to minimize the impact of Bell's voice, but her voice remained audible inside the clinic. In contrast, other street noises, including the trolley, were virtually inaudible.

The judge found that Bell's shouts distressed clinic patients and staff, created anxiety, and impeded the effective provision of medical services. Patients who were the target of Bell's advances outside the clinic often entered crying, trembling, and exhibiting other symptoms of fear and apprehension. As a result, clinic staff had to take time away from providing medical services in order to calm patients instead. The judge also found that those patients who reacted to Bell's advances by turning away from the clinic were subject to increased health risks due to the delay in services.

On December 30, 1994, an unrelated shooting occurred at the clinic. Several people were injured, and the clinic's receptionist was killed. The judge found that Bell still persisted in her tactics, and that after the shooting, the patients' adverse reactions to Bell's conduct intensified. Patients often had to remain outside the clinic, waiting to pass through a metal detector which was installed at the entrance to the clinic after the shooting. Consequently, such patients were subject to Bell's conduct for an extended period.

Based on these findings, the judge ruled that Bell's activity crossed the boundary from protected speech to prohibited conduct, creating a nuisance which disrupted the clinic's efforts to provide safe medical services and interfered with

---

[2]The court noted that patients who cannot read English were particularly likely to be confused by Bell's pinney.

patients' exercise of their right to abortion. Because of the time-sensitive nature of that right, Bell's conduct caused irreparable physical and emotional harm. See *Bellotti* v. *Baird,* 443 U.S. 622, 642 (1979); *Planned Parenthood League of Mass., Inc.* v. *Operation Rescue,* 406 Mass. 701, 710 (1990). Bell repeatedly and knowingly had violated prior court orders by continuing to wear a pinney, and by blocking, harassing, and intimidating patients who attempted to enter the clinic. The judge further noted that the stipulation and order which prohibited Bell from using sound amplification devices had not achieved its desired result because, even unamplified, Bell's voice is strong and loud enough to be heard inside the clinic.

The judge determined that the imposition of a fifty-foot distance restriction advanced several significant public interests, including ensuring public safety and order, protecting a woman's freedom to seek lawful medical or counselling services, protecting the psychological and physical well being of patients, and maintaining the integrity of court orders. See *Madsen* v. *Women's Health Ctr., Inc.,* 512 U.S. 753, 767-768 (1994). The remedy was no broader than necessary to achieve the desired result of enabling patients to park near the clinic or arrive by trolley and enter the clinic without their access impeded by Bell, and Bell could still engage in constitutionally protected speech outside of fifty feet from the clinic.[3] See *id.* at 770. The judge concluded that the buffer zone, on balance, burdens no more speech than necessary to accomplish these significant public interests. See *id.* at 775.

I. *Standing.* We begin by addressing Bell's contention that PPLM does not have standing to obtain the preliminary injunction at issue. Under the common law of the Com-

---

[3]Prior to the final arguments and the issuance of the injunction, defense counsel described Beacon Street (divided roadway with trolley tracks running into and out of Boston) to the judge. He noted that the clinic side of Beacon Street consists of three lanes: one parking lane and two travel lanes. Each lane is approximately twelve feet wide, making the entire width of the clinic side of the street approximately thirty-six feet. There are approximately ten additional feet from the sidewalk to the entrance of the clinic, or clinic property. Defense counsel explained that therefore a fifty-foot distance restriction would place the defendant across the clinic side of Beacon Street and onto the median strip where the trolley tracks run. Plaintiff's counsel confirmed that it is fifty feet from the front of the clinic to the trolley tracks.

monwealth, a private plaintiff may maintain a public nuisance[4] action if the public nuisance has caused the plaintiff some special injury of a direct and substantial character other than that borne by the general public. See *Connerty* v. *Metropolitan Dist. Comm'n*, 398 Mass 140, 148 (1986); *Wesson* v. *Washburn Iron Co.*, 13 Allen 95, 100-104 (1866). PPLM has alleged that Bell's conduct constitutes a public nuisance which has caused its patients special injury by interfering with the exercise of their right to obtain an abortion. "At the very least, the right to choose to terminate a pregnancy by abortion has been recognized as a substantive right under both the Federal and State Constitutions." *Planned Parenthood League of Mass., Inc.* v. *Operation Rescue*, 406 Mass. 701, 707 (1990), citing *Roe* v. *Wade*, 410 U.S. 113 (1973), and *Moe* v. *Secretary of Admin. & Fin.*, 382 Mass. 629 (1981). Given the nature of the injury involved, we believe that this allegation would sufficiently state a case in public nuisance if the patients had been included as plaintiffs. See *Connerty, supra*. However, PPLM maintains that as an abortion provider, it has representational standing to argue the rights of its patients who are not parties to the action.[5] See *Planned Parenthood League of Mass., Inc.* v. *Blake*, 417 Mass. 467, 472 & n.7, cert. denied, 513 U.S. 868 (1994).

Although jus tertii standing is infrequently granted, the United States Supreme Court has established that it is appropriate in the presence of two factual elements. See *Singleton* v. *Wulff*, 428 U.S. 106, 113-118 (1976). First, the relationship of the litigant to the third party whose right the litigant seeks to assert must be such that "the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue." *Id.* at 114. Second, there must be some genuine obstacle that renders the third party unable to assert the allegedly affected right on his or her own behalf. *Id.* at 115-116. As a prudential matter, physicians are well situated to argue the rights of women patients regarding

[4]"A nuisance is public when it interferes with the exercise of a public right by directly encroaching on public property or by causing a common injury." *Connerty* v. *Metropolitan Dist. Comm'n*, 398 Mass 140, 148 (1986).

[5]The judge found that the clinic had sustained special injuries in its own right as a result of the public nuisance created by Bell's conduct, and therefore ruled that PPLM had direct standing to seek injunctive relief on its own behalf. In the view we take, we need not reach this issue because PPLM's representational standing supports the maintenance of this action.

interference with the abortion decision because the nature of the doctor-patient relationship assures effective presentation of the patients' rights, and a woman's assertion of her own rights may be obstructed by privacy and mootness issues. *Id.* at 116-118 (plurality granting physicians representational standing to challenge abortion statute). Accord *Doe* v. *Bolton,* 410 U.S. 179, 188 (1973) (physician has standing to challenge abortion statute due to "sufficiently direct threat of personal detriment"). See also *Margaret S.* v. *Edwards,* 794 F.2d 994, 997 (5th Cir. 1986) ("the Supreme Court has visibly relaxed its traditional standing principles in deciding abortion cases").

Lower Federal courts have generally held that abortion providers have representational standing to argue the constitutional rights of their patients. See, e.g., *New York St. Nat'l Org. for Women* v. *Terry,* 886 F.2d 1339, 1347-1348 (2d Cir. 1989), cert. denied, 495 U.S. 947 (1990); *Planned Parenthood Ass'n of Cincinnati, Inc.* v. *Cincinnati,* 822 F.2d 1390, 1394-1396 (6th Cir. 1987). See also *Volunteer Medical Clinic, Inc.* v. *Operation Rescue,* 948 F.2d 218, 223 (6th Cir. 1991) ("the rights of women seeking to exercise their Fourteenth Amendment right to an abortion [are] inextricably bound up with the services provided by the clinic, and . . . 'women seeking to assert that right for themselves are faced with several obstacles' "). We hold that in these circumstances where access to abortion is concerned, PPLM has standing to bring the present action against Bell.

II. *The preliminary injunction.* The traditional standard for reviewing the issuance of a preliminary injunction is "whether the [trial] court abused its discretion. An appellate court's role is to decide whether the [trial] court applied proper legal standards and whether there was reasonable support for its evaluation of factual questions." *Planned Parenthood League of Mass., Inc.* v. *Operation Rescue,* 406 Mass. 701, 710 (1990). However, Bell claims that the challenged activity on which the judge based the issuance of the injunction is in the nature of constitutionally protected speech. Bell's invocation of the First Amendment requires us to engage in an independent examination of the whole record to "decide for ourselves whether a given course of conduct falls on the near or far side of the line of constitutional protection," notwithstanding the

trial judge's conclusions to the contrary.[6] See *Hurley* v. *Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 567 (1995) (requirement of independent appellate review is a rule of Federal constitutional law).

The judge concluded that Bell creates an actionable nuisance and issued the injunction based on three categories of Bell's activity: her wearing of pinneys in violation of the first court order, the volume of her voice, and her blocking of patients in violation of the second court order. After careful consideration of the entire record, we agree with the judge's findings and conclude that the factual characteristics of Bell's activity place it outside of the realm of constitutionally protected speech. See *Hurley, supra* at 567-568. We address each basis in turn.

First, Bell's violation of the pinney injunction is amply demonstrated by live testimony and by videotape evidence which clearly depicts Bell outside the clinic on several occasions wearing a pinney closely resembling those worn by the clinic escorts. Bell argues that she did not violate the injunction because since her pinney is larger, pocketed, and bears different lettering than the escorts' pinneys, she did not misrepresent herself as a clinic affiliate. Bell's argument is rendered suspect by her practice of changing pinneys to correspond with the color worn by the clinic escorts.[7] Regardless, our review of the videotape convinces us that these slight factual dissimilarities do not sufficiently differentiate Bell's pinneys such that patients would not easily mistake her as an affiliate of the clinic, particularly in light of potential language barriers and the short time frame during which a patient approached by Bell and the escorts must process who is who. Our conclusion is further buttressed by testimony that patients did become confused and assume Bell was an escort. The First Amendment does not shelter Bell's persistent violation of an existing court order.[8]

Second, Bell does not contest the judge's finding that the

[6]Bell has not argued that the State Constitution provides her greater protection than does the First Amendment. Thus, we decide this issue solely under Federal constitutional law.

[7]Three witnesses testified to Bell's behavior on this point. One witness testified that Bell kept a pinney in the trunk of her car and switched colors midmorning after observing the escorts do so.

[8]After our decision in *Planned Parenthood League of Mass., Inc.* v. *Operation Rescue, supra,* and further proceedings in the Superior Court, the

volume of her voice is such that despite the clinic's measures to diminish its impact, her voice reaches the interior of the clinic.[9] Rather, Bell claims that the judge issued the injunction based on the content of her speech, not the volume at which the words were spoken. See *Madsen, supra* at 763. Bell correctly states that, absent evidence that her speech is independently proscribable (i.e., "fighting words" or threats), it would be impermissible for the judge to have considered the content or meaning of Bell's message in issuing the injunction. See *id.* at 774. However, any person bellowing into the entrance of a medical facility creates a noxious and unwelcome condition inside, regardless of what he or she is shouting. After careful consideration of the record, we cannot conclude that the judge based the injunction on the content of Bell's speech rather than on the volume of her voice.

Recognizing that "[n]oise control is particularly important around hospitals and medical facilities," the United States Supreme Court made clear in *Madsen, supra* at 772-773, that the "First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political protests." See also *NLRB* v. *Baptist Hosp., Inc.,* 442 U.S. 773, 783-784 n.12 (1979), quoting *Beth Israel Hosp.* v. *NLRB,* 437 U.S. 483, 509 (1978) (Blackmun, J., concurring) (" 'Hospitals, after all are not factories or mines or assembly plants. They are hospitals, where human ailments are treated, where patients and relatives alike often are

judge permanently enjoined Bell from wearing pinneys similar to those worn by the clinic escorts. Bell did not appeal from that permanent injunction. See also *Planned Parenthood League of Mass., Inc.* v. *Blake,* 417 Mass. 467, cert. denied, 513 U.S. 868 (1994). We note that the judge who issued the pinney injunction found that "[t]he actions of [another protester] and Bell in wearing 'clinic escort' pinneys and representing themselves to be agents of Planned Parenthood were intended to harass and annoy the clinic's patients." The judge held that although this activity does not "rise[] to the level of threats, intimidation and coercion necessary to constitute a violation of the [Massachusetts Civil Rights Act] . . . [it] does, however, constitute intentional interference with the clinic's contractual relations with its patients, without any right or justification, and such conduct must therefore be enjoined." After the injunction issued, Bell changed the lettering on her pinney from "Clinic Escort" to "Choose Life." However, the injunction made no reference to lettering and clearly prohibited Bell from wearing any pinney similar to those worn by the escorts.

[9] We note that this finding is well substantiated by the record. Even a witness appearing on Bell's behalf testified that Bell "talked into the clinic," raising her voice so as to be heard by the women inside.

under emotional strain and worry, where pleasing and comforting patients are principal facets of the day's activity, and where the patient and his family . . . need a restful, uncluttered, relaxing, and helpful atmosphere' "). Bell's practice of hollering into the clinic is clearly actionable conduct unprotected by the First Amendment.

Third, Bell challenges the judge's finding that she blocked patients seeking to enter the clinic. Bell claims she was merely engaging in "sidewalk counselling," by which she approaches patients and attempts to dissuade them from having an abortion. Bell argues that the judge mischaracterized this classic exercise of her First Amendment right to speak in a public forum as harassment, intimidation, and blocking.

Five witnesses testified as to Bell's conduct in confronting patients. All of them, including a fellow sidewalk counsellor who testified on Bell's behalf, confirmed that Bell stood in front of patients as they attempted to enter the clinic. One witness testified that Bell's conduct included "blocking, standing so close to the patients so that they can't move." The witness described the efforts of the clinic escorts to assist patients in getting past Bell: "We'll just get into position beside the patient, one on each side, and we'll try to go forward, and on the worst scenario, Barbara Bell will be in front facing us, and when we move to one side, she'll move to one side, and we'll move to the other side, and she'll move to the other side, too. We're kind of doing a dance down the street." Another witness stated that when snowbanks bound the sidewalk, patients could not get past Bell unless they pushed into her or climbed over the snowbanks. There was also testimony that Bell stood closely in front of car doors, "trapping" patients in their cars.

Bell argues that we should discount this live testimony in light of the judge's finding that the videotape of Bell "shows no blocking, whatsoever."[10] However, the videotape is not conclusive where there is strong live testimony. See *Madsen, supra* at 770. ("witnesses also testified as to relevant facts in

---

[10]We note that the videotape does show Bell crowding patients, shouting loudly into their faces from an extremely close proximity, giving chase to a woman who runs away from her into a busy street, and standing closely in front of the door of a car idling in a busy traffic lane. We need not address whether this behavior is itself prohibited because the issuance of the injunction is well supported on other bases.

a [three]-day evidentiary hearing, and the state court was therefore not limited to . . . the videotape to make its findings in support of the [broader] injunction"). See also *Hurley, supra* at 567-568 (the requirement of independent appellate review does not limit our deference to a trial judge on matters of witness credibility). We conclude that, as the judge found, the record amply demonstrates that Bell, who is a tall and large woman, routinely positioned herself so as to impede and obstruct the progress or passage of patients to the clinic, thereby engaging in behavior which constitutes "blocking" in the most basic sense of the word. See Webster's Third New Int'l Dictionary 235 (1961).

Bell's First Amendment right to engage in "sidewalk counselling" does not encompass the right to obstruct women in the exercise of their constitutional right to seek lawful medical or counselling services regarding abortion. See *Madsen, supra* at 767, 768. See also *Planned Parenthood League of Mass., Inc.* v. *Operation Rescue, supra* at 716, quoting *Brookline* v. *Goldstein,* 388 Mass. 443, 450 (1983) ("The right to free speech '[does] not disable the government from taking reasonable steps to ensure that [this right is] not exercised in a manner which infringes on the legitimate rights of other citizens' ").

In sum, Bell's blocking of patients, her repeated violation of prior court orders, and the volume of her shouting is objectionable activity unsheltered by the First Amendment. We therefore reject Bell's claim that the preliminary injunction is content or viewpoint based. The purpose of the injunction is not to suppress Bell's antiabortion message, but rather to prevent her from further engaging in objectionable activity. See *Madsen, supra* at 763-765 (holding injunction content neutral because the court's purpose in imposing restrictions on petitioners incidental to their antiabortion message was that they repeatedly violated the court's original order). We think that the injunction was justified "without reference to the content of the regulated speech." *Madsen, supra* at 763, quoting *Ward* v. *Rock Against Racism,* 491 U.S. 781, 791 (1989).

We now address Bell's argument that the remedy is unconstitutionally overbroad because it prohibits her from engaging even in protected activity within fifty feet of the clinic. See *Planned Parenthood League of Mass., Inc.* v. *Opera-*

*tion Rescue, supra* at 713 (judge must carefully tailor an injunction so as to avoid an impermissible infringement on protected expression). Recently, in *Schenck* v. *Pro-Choice Network of W.N.Y.*, 117 S. Ct. 855 (1997), the United States Supreme Court reaffirmed *Madsen* and again upheld the imposition of a fixed buffer zone to ensure clinic access. In *Madsen, supra* at 765, the Court established that "when evaluating a content-neutral injunction, . . . [the] standard time, place, and manner analysis is not sufficiently rigorous. We must ask instead whether . . . 'the injunction burden[s] no more speech than necessary to serve a significant government interest.' " Here, the judge determined that the interests served by the injunction include ensuring public safety and order, protecting a woman's freedom to seek lawful medical and counselling services, protecting the physical and psychological well-being of patients, and maintaining the integrity of court orders. We think, as the Supreme Court did in *Madsen, supra* at 766, and in *Schenck, supra* at 866, that these governmental interests are "certainly significant enough to justify an appropriately tailored injunction to secure unimpeded physical access to the clinics."

In considering the scope of the restriction imposed on Bell, we note that the injunction upheld in *Madsen* created an essentially absolute speech-free buffer zone which admitted no antiabortion protestors within thirty-six feet of the clinic.[11] Here, the injunction is significantly narrower in that it is directed to only one individual who has a long history before the court. In light of Bell's recalcitrance, the judge concluded that the fifty-foot distance restriction was necessary to protect clinic access by allowing patients to park near the clinic, or arrive by trolley, and enter the clinic without their access impeded by Bell. Three prior court orders have failed to restrain Bell from engaging in objectionable behavior. She has disobeyed other injunctions by continuing to misrepresent herself as a clinic affiliate and by blocking patients seeking to enter the clinic. The order banning Bell from amplifying her

---

[11]The court order upheld in *Madsen* v. *Women's Health Ctr., Inc.*, 512 U.S. 753 (1994), was directed not only to the petitioners, but also to "Operation Rescue, Operation Rescue America, Operation Goliath, their officers, agents, members, employees and servants, and . . . all persons acting in concert or participation with them, or on their behalf." See *id.* at 758 n.1.

voice has not achieved its purpose because Bell's unamplified voice can still be heard inside the clinic. "The failure of the [previous] order[s] to accomplish [their] purpose may be taken into consideration in evaluating the constitutionality of the broader order." *Madsen, supra* at 770.

Bell claims that the court should have ignored her violations of the pinney and antiblocking injunctions, leaving those issues to be tried in separate contempt proceedings, and imposed the less restrictive remedy of ordering her to lower her voice. We do not agree. The judge was required to consider the full extent of Bell's conduct as shown by the plaintiff in the case before her, including the violations, in determining whether Bell created a public nuisance. Having considered all the testimony as well as the prior orders, the judge properly issued an injunction that effectively addressed all three forms of Bell's unprotected conduct.

In sum, under the injunction, Bell would be far enough away so that she could no longer obstruct patient access, be heard inside the clinic, or be mistaken for a clinic escort because of her pinney. The need for a distance restriction may be debatable, "but some deference must be given to the [trial judge's] familiarity with the facts and the background of the dispute between the parties even under our heightened review." *Madsen, supra* at 770. See *Schenck, supra* at 869. On balance, we think that the fifty-foot distance restriction imposed on Bell burdens speech no more than necessary to serve the significant public interests at stake.

Bell still can engage in constitutionally protected speech while standing across the street, or two buildings away to the left and to the right of the clinic. From that distance,[12] particularly given the volume of her voice, she can still be seen and heard by patients arriving at the clinic. See *Madsen, supra* at 770.

*Judgment affirmed.*

---

[12]While Bell has argued against the imposition of any distance restriction, she never has contested its fifty-foot range. Accordingly, we do not reach this issue except to note that the distance restriction imposed on Bell is only fourteen feet greater than that upheld in *Madsen*. See also *Schenck v. Pro-Choice Network of W.N.Y.*, 117 S. Ct. 855, 869 (1997) (declining to "quibble" about the range of the fixed buffer zone and deferring to the trial court's "reasonable assessment of the number of feet necessary" to fulfil the goal of ensuring clinic access). See note 3, *supra*.