Toomey, J.
This matter is before this Court on the motion of the plaintiff, American Stop Loss Insurance Brokerage Services, Inc. (ASL), for a preliminary injunction. ASL argues that a former employee, Richard J. Prince (Prince), violated the terms of a non-competition agreement signed by Prince at the commencement of his employment at ASL. ASL asks this Court to enjoin Prince from further violating the terms of the agreement. Prince counters that ASL breached its obligations under the employment agreement, that ASL failed to act equitably, that the agreement does not protect a legitimate business interest of ASL, that the agreement is unreasonable in scope and that the requirements for a preliminary injunction have not otherwise been met. For the reasons set forth below, ASL’s motion for a preliminary injunction is, in part, ALLOWED.
BACKGROUND
ASL is engaged in the business of brokering medical stop loss insurance and related services for its clients. Stop loss insurance products provide group insurers, such as municipalities or other large self-insured employers, with protection from catastrophic, high-cost claims from members of their group. ASL acts as a broker for clients seeking that type of insurance. Sales representatives of ASL contact potential clients to solicit requests for proposals (RFPs), distribute those RFPs to managing general underwriters (MGUs), receive quotes back from the MGUs and arrange for sales of a stop loss product in return for an annual premium payment. ASL then charges its clients a commission for its services and the commissions paid to the sales representatives, such as Prince, are calculated with references to that foundation commission.
Prince began employment at ASL in 1994, one year after his graduation from Salem State College. He interviewed for a sales representative position with ASL, then known as New England Trust, and was offered a position in November 1994 for a base salary of $25,000 plus 20% commission on both new sales accounts and renewals. He accepted the offer and began work on December 5, 1994. On that day, Prince signed an Employment Agreement that outlined his compensation structure; the Employment Agreement was also signed by Walter Coolidge, the president of New England Trust. Later that same day, Prince was presented with a Non-Competition Agreement (Agreement) and directed to sign it. He complied. New England Trust changed its name to American Stop Loss Brokerage Insurance in 1995, but Prince was not asked to sign either a new Employment Agreement or a new Non-Compete Agreement with his re-named employer.
Prince remained with ASL for the next six years, during which his income increased each yearfrom $45,259 in 1995 to $240,749 in 2000. His commission income accounted for all of the increases, as his base salary remained at $25,000. In 1996, ASL began to make changes to Prince’s commission structure, reducing his renewal commissions from 20% to 15%. In July 2000, further changes in the payment schedule for renewal commissions were proposed. Those changes, to be effective in 2001, would result in the elimination of all of Prince’s renewal commissions. As renewal commissions were a significant percentage of his income, Prince was, understandably, concerned about the proposed diminution in his earnings and attempted to negotiate a compensation package that included a higher base salary, $80,000, and a 50% percent commission on new accounts. ASL rejected Prince’s suggestion and countered with an offer that would eliminate his renewal commissions, increase his base salary to $50,000, and slightly increase his commission on new business. Unwilling to accept the ASL counter, Prince resigned on December 6, 2000.
DISCUSSION
To obtain preliminary injunctive relief, ASL must satisfy a tripartite test: (1) ASL has a reasonable likelihood of success on the merits; (2) ASL will suffer irreparable harm if the injunction is not granted; and (3) the harm ASL will suffer if the injunction is denied outweighs the injury Prince will suffer if the injunction is granted. Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-617 (1980). We shall assess each component.
1. Likelihood of Success on the Merits
While reasonable non-competition agreements may be enforced by the court, such agreements are scrutinized carefully and strictly construed against the employer. Sentry Insurance v. Firnstein, 14 Mass.App.Ct. 706, 707 (1982); Alexander & Alexander, Inc. v. Danahy, 21 Mass.App.Ct. 488, 496 (1986). An employer may successfully seek enforcement of the terms of a non-solicitation agreement with a former employee when it demonstrates that the agreement is necessary to protect a legitimate business interest of the employer, is supported by consideration, is reasonably limited in all circumstances, including time and space, and is otherwise consonant with public policy. Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 102-03 (1962). See also, Blackwell v. E.M. Helides, Jr., Inc., 368 Mass. 225, 228 (1975); All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974). The burden of proof as to the enforceability of a non-competition agreement is on the employer. Folsom Funeral Service v. Rodgers, 6 Mass.App.Ct. 843, 843 (1978).
The appellate courts of this Commonwealth have recognized goodwill as a legitimate business interest. New England Canteen Service, Inc. v. Ashley, 372 Mass. 671, 674 (1977); New England Tree Expert Co. v. Russell, 306 Mass. 504, 509 (1940). Goodwill is a broad term and encompasses a variety of intangible business attributes such as the “name, location and reputation, which tends to enable the business to ‘to retain [its] patronage.’ ” Slate Co. v. Bikash, 343 Mass. *652 172, 175-76 (1961). The covenant is, however, unenforceable if its application results only in protecting the employer from ordinary competition. Marine Contractors Co., Inc. v. Hurley, 365 Mass. 280 (1974). ASL alleges that its goodwill has been damaged by the defendant and that, because of Prince’s plans to continue his employment in the stop loss insurance area, its goodwill remains vulnerable to further harm.
This Court accepts the proposition that the stop loss insurance business does indeed involve goodwill and that the goodwill belongs to ASL. Employer goodwill has been defined as the employer’s positive reputation in the eyes of its customers or potential customers. Marine Contractors Co., 365 Mass. at 287-89. Goodwill is generated by repeat business with existing customers or by referrals to potential customers. Id.
At bar, the goodwill factor is not insignificant. ASL hired Prince to use his knowledge, skill and personality to cultivate relationships with clients on behalf of ASL. The goodwill generated with respect to new and renewal clients developed by Prince while employed at ASL belongs to ASL. Finally, although this Court has been offered no evidence of the existence of any trade secrets of ASL that might merit protection by the Agreement, the Court does conclude that, to the extent that any client list contains confidential or proprietary information not available to others in the public, such list also falls within the protected scope of the Agreement.
The time and geographic area covered by the covenant must also be reasonable. Here, the covenant is, admittedly, unrestricted as to space and imposes a one-year limitation on Prince’s employment in the stop loss insurance business. Those attributes, however, do not, in the circumstances at bar, illegitimize the covenant. As to scope, the facts in this case show that the market for stop loss insurance products is nationwide. Accordingly, the Agreement, although not restricted to a geographic locus, is reasonable in area. As to time, Massachusetts courts have consistently enforced covenants of up to two years if the covenants are otherwise reasonable under the circumstances. See All Stainless, supra at 779. This court finds that the one year duration of the instant Agreement is not unreasonable. The covenant is, therefore, enforceable to the extent necessary to protect ASL’s legitimate business interests.
Prince argues, alternatively, that the restrictive covenant in his contract should not be enforced because ASL materially breached the contract by unilaterally changing the commission structure of Prince’s Employment Agreement and thus now seeks equity with “unclean hands.” See Ward v. American Mutual Liability Insurance Co., 15 Mass.App.Ct. 98, 101 (1983). It is undisputed that changes in the commission structure were unilaterally imposed during the course of Prince’s employment. But, Prince did not protest the changes, remaining in his position and, from 1996 through his resignation in December 2000, earning increasingly more money in commissions. Until the modification proposed for 2001, Prince had assented, as evidenced by his continued employment at ASL and acceptance of the commissions, to the changes directed by ASL. Prince is, therefore, not well positioned to assert that ASL comes to this court with “unclean hands.”
For the reasons aforestated, ASL has, we conclude, a reasonable likelihood of success on the merits of its suit.
2. Irreparable Harm
Irreparable harm occurs when a loss of rights cannot be remedied even though the party seeking an injunction prevails after a full hearing on the merits. Planned Parenthood League of Massachusetts, Inc. v. Operation Rescue, 406 Mass. 701, 710 (1990). At bar, ASL is concerned that the actual and potential loss of goodwill and the alienation of confidential information retained by Prince will be irremediable should ASL prevail at trial. In this Commonwealth, the loss of goodwill has been recognized as being particularly hard to quantify in the damages assessment context. Accordingly, the need for equitable relief is more compelling where goodwill is at risk. This Court is persuaded that ASL is in jeopardy of irreparable harm. See Kroeger v. Stop & Shop Companies, Inc., 13 Mass.App.Ct. 310, 322 (1982).
3. Balance of Harms
Injunctive relief in favor of ASL will not injure Prince sufficiently to warrant abandonment of ASL’s right to protect its good will. There is enough potential hardship, however, that this Court will, in the exercise of its equitable discretion, modify the scope of ASL’s request for relief. We will be guided by the principle that “[i]t is settled in this Commonwealth that such contracts are divisible and will not be enforced as to any parts of the covenant that are not necessary for the protection of the goodwill of the employer’s business.” New England Tree Expert Co, Inc., 306 Mass. at 509. Equitable relief should only reach conduct that imperils the goodwill and proprietary information to which ASL has a claim of right. The remedy hereinafter fashioned reflects that proposition.
Thus, the result reached at bar, while restricting Prince’s employment in the area of selling stop loss insurance, will not prevent him from working in another capacity at a stop loss insurance company or in a company dealing with any other type of insurance. He will not, however, be permitted to use proprietary ASL information nor will he be allowed to call upon any entities seeking stop loss insurance that he serviced while employed at ASL. The preclusions compelled by this determination will, of course, terminate on the earlier of either the date of the expiration of the non-competition agreement (December 6, 2001) or the date of a contrary result entered after trial.
*653 ORDER
For the reasons aforesaid, it is hereby ORDERED that Defendant Richard J. Prince is preliminarily enjoined, until December 6, 2001, from:
1. With respect to any entities with whom he conducted business while employed at ASL, directly or indirectly (a) soliciting any business or (b) providing any products or services or (c) utilizing any underwriter;
2. Encouraging any ASL client or underwriter to stop carrying out any activity related to a product or service it acquired from or through ASL;
3. Using confidential or proprietary information belonging to ASL in connection with any business in competition with ASL;
4. Directly or indirectly competing with ASL;
5. Reproducing or retaining records and materials belonging to ASL; and
6. Accepting employment, involving stop loss insurance, in any business activity.