Fecteau, J.
This matter, by which the plaintiff seeks to enforce a “non-compete” agreement against its former employee, the defendant Stephan Hess, and against his new employer, the defendant Tyrolit North America, Inc., began by the filing of the plaintiffs complaint on January 30, 2001. This matter came before the court on January 31, 2001 for consideration of the plaintiffs ex parte motion for a temporary restraining order, which the court allowed, on condition of the filing of security in the form of a bond in the amount of $65,000.00; a short order of notice was also ordered for hearing on the plaintiffs request for a preliminary injunction on February 5, 2001. A hearing was conducted at that time with the defendants appearing and arguments were made. The court shared its observation and recommendation that the hearing on the preliminary injunction be consolidated with a speedy trial on the merits, especially given that the non-compete clause had a duration of 1 year. The parties were amenable to such a course. The court extended the temporary restraining order to provide additional time to the defendants to prepare, allowed expedited discovery and granted the parties an evidentiary hearing on the dispute, given the fact-intensive nature of the controversy, to be conducted on March 1, 2001. Thereafter, the parties jointly requested additional time within which to complete discovery and requested that the hearing be postponed generally until they were ready for trial.
The parties requested in August 2001, that a further evidentiary hearing be held but that the court reconsider the consolidation of the trial on the merits with the preliminary injunction; the parties agreed that although they were not ready to proceed to a trial on the merits, circumstances were such that an expedient hearing on the preliminary injunction was necessary. The court agreed and the matter was finally convened for hearing on September 20, 2001. The parties submitted briefs and affidavits, as well as presented witnesses.
Therefore, in consideration of the pleadings, evidence, including affidavits, and arguments of the parties in support of and in opposition to the entry of a preliminary injunction, the court makes the following findings of fact and rulings of law. In determining whether to grant a preliminary injunction, this court considers the balancing test set forth in Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). See also Planned Parenthood League of Massachusetts, Inc. v. Operation Rescue, 406 Mass. 701, 710 (1990). Also, given the agreement of the parties as to the choice of the law, the standards of Pennsylvania law are considered. Those are recognized as allowing enforcement of such agreements if the covenant not to compete is (1) ancillary to the taking of employment [including promotions], (2) supported by adequate consideration, (3) reasonably limited in time and geographic scope and (4) reasonably designed to safeguard a legitimate interest of the former employer. National Bus. Servs., Inc. v. Wright, 2 F.Sup.2d 701, 707 (E.Dist.Pa.1998); Thermo-Guard, Inc. v. Cochran, 596 A.2d 188, 192-94 (1991).
This matter specifically involves the interpretation and enforcement of clause 7 of the employee “non-compete” agreement signed by the defendant Hess on *163 or about March 30, 1999. (See ex. 22.) This clause states, in relevant part, that the employee “shall not without, written consent of an officer of the company, directly or indirectly (whether as owner, partner, consultant, employee, or otherwise), at any time during the one year period following termination of [his] employment . . . engage in or contribute [his] knowledge to any work or activity that involves a product, process, apparatus, service or development (i) which is then competitive with or similar to a product, process, apparatus, service or development on which [he] worked or (ii) with respect to which [he] had access to Confidential Information while at the company at any time during the period prior to such termination.”
Hess was employed by Norton Company as an engineer in its research and development group in the “vitrified” branch of its abrasives business and later as an applications engineer in the superabrasives division.[1] For purposes of this discussion, that confidential information was available to Hess is assumed and that the scope of information considered confidential hereunder is inclusive of but broader than trade secrets.
First, Hess agrees that with respect to his prior work for the plaintiff, he is subject to so much of the agreement as would prevent his working in the vitrified and superabrasives areas for the restrictive period (subpart “(i)” of the clause). His intended employment for the defendant Tyrolit North America, Inc., is in its metal fabrications area, synonymous with or similar enough to the organics abrasives division of Norton. The plaintiff seeks to bar Hess from such work as well, contending that as an engineer in the R&D at Norton Company, he had access to confidential information concerning this area, notwithstanding that his only significant work for the plaintiff was in the vitrified and superabrasives branches of the business.
There has been no evidence of his having actually violated the non-disclosure or confidentiality aspects of the agreement (see clauses 2, 3 and 5), nor that he has retained any written documents of the company in violation of the requirements for the return of such documents upon his termination, nor that he has shared the contents of any such documents or confidential information with anyone in violation of his duties under this agreement. There is no question that the non-disclosure requirements of the agreement continue to be operative and the defendant recognizes and acknowledges his duty thereunder.
The subject at issue among the parties, then, is whether subpart “(ii)” of clause 7 applies to Hess’ intended work in the organic or metal fabrications area since he may have had “access” to confidential information, in R&D research reports either distributed to him or through his department, or available at the R&D library, or access to oral or written presentations at department meetings, conferences and trade shows.
The evidence appears to be that Hess worked only in the vitrified and superabrasives areas, although a small aspect of both areas have organic components; no evidence was presented that Hess had devoted any significant time or effort to organic matters.[2] The critical issues of concern are the meaning of the term “access” and whether he had such “access” to Confidential Information relative to organic products, process, apparatus service or development. Until July 1997, the vitrified and organic branches of R&D worked almost entirely separately. At that point in time, some “cross-fertilization” began to occur at joint weekly meetings and in the receipt of quarterly research reports. Hess left R&D in February 1998, although he would have been allowed to attend company world meetings and may have been allowed to give or attend R&D presentations thereafter. There was no evidence that he was at any particular meeting at which organic subjects were discussed nor is there evidence that he was exposed to confidential information that was created by or on behalf of any department other than the R&D department. There is evidence that, although most, if not all employees to whom confidential information was available were subject to non-disclosure or confidentiality agreements, not all were subject to non-competition agreements, including some in supervision of Hess directly or indirectly.
The critical threshold issue is the meaning of “access” as such word is used in the document in question. The plaintiff takes the position that since Confidential Information concerning aspects of organic abrasives was available to its former employee, Hess’ work on any such product, process or development is barred under subpart “(ii),” whether or not he in fact received, read or retained any such information. Hess contends that such a broad definition leads to an interpretation that results in his being unable to work for any company that has any product, process or development that competes with any product, process or development of Norton Company, whether or not he worked on such a product or process or spent any significant time or effort in research on such a product or process in connection with his significant work.
Norton agrees that the agreement neither prohibits nor was it intended to bar Hess from work for a company that had any products or processes competitive with those of the plaintiff. However, it says that the fact that confidential information was “available” to the plaintiff in the library or in company research reports or in oral presentations, thus barring his employment for any company with any similar product or process, does not amount to the same prohibition. However, taken to its logical conclusion, that appears to be the meaning sought to be enforced by the plaintiff. Arguably, confidential information concerning every Norton Company product and technology was *164 available to him while at R&D. Norton knew that when it required Hess to sign the agreement, Hess had been away from the R&D department for one year and not until given a promotion, and at no time prior thereto, had Norton required the defendant to sign such a “non-compete” agreement.[3] Indeed, the letter of transmittal refers to the need for the non-competition agreement to be signed “by employees who are transferred into positions exposing them to sensitive information.” (See ex. 21, memorandum dated March 19, 1999, from Sonya Simonian to the defendant Hess.) Several of Hess’ former superiors in the chain of command in the R&D group apparently are not, even now, subject to non-compete agreements, although most R&D employees have signed non-disclosure agreements.
If the intent of the plaintiff was to prevent him from being able to work for any company with any competing product or process, words could have been selected that could have stated such a prohibition, in unmistakeable language. Since such broad language was not chosen, an inference can be and is thus drawn that the intent of this clause was not as broad and that something less than a total prohibition was intended. The fact that Hess may have received a research report concerning some aspect of organic abrasives that was distributed to him routinely, or that he may have been casually exposed to a presentation concerning organic abrasives does not equate with his having a dedicated need or interest in its contents, notwithstanding that the dictionary definition of “access” simply is the ability or capacity to enter, approach or use. If the agreement intended to bar employment due to simple theoretical access or availability, under the circumstances of this case, it would amount to the equivalent of a prohibition from employment with any competitor and would thus be unreasonable in scope, given these circumstances. Thus, under the circumstances of this case, theoretical “availability” cannot have been the intended meaning of “access,” but, instead, I find that the intended meaning of “access” is that confidential information was actually gained or utilized by Hess in some direct manner either on behalf of the interests of Norton Company, for his own interests or that of another, such as Tyrolit.
Thus I find that since Hess had neither the need nor interest to access confidential information that was available to him in the area of organic/metal fabrication abrasives, nor gained such information, subpart “(ii)” of clause 7 does not bar him from such work for Tyrolit, and that:
1.failure to issue a preliminary injunction as broad as that sought by the plaintiff will not subject the moving party to a substantial risk of irreparable harm, i.e., loss of rights not capable of remediation by a final judgment in law or equity should the moving party prevail after a full hearing on the merits;
2. there is a likelihood that the moving party will not be successful after a full hearing on the merits in connection with the application of clause 7 to the intended employment of the defendant Hess and especially in connection with subpart “(ii)";
3. the granting of the preliminary injunction proposed by the plaintiff will create a substantial risk of irreparable harm to the defendant Hess;
4. there is a likelihood that the defendants will be successful after a full hearing on the merits;
5. in balancing the equities as they appear today, the court concludes that the risk of irreparable harm to the moving party, viewed in the light of that party’s chances of success on the merits of the case, does not outweigh the probable harm to the opposing party, viewed in the light of that party’s likelihood of prevailing on the merits of the case.
Accordingly, based upon the foregoing findings of fact and rulings of law, the application for the entry of a preliminary injunction as broad as that sought by the plaintiff is denied. An injunction shall be entered, however, substantially in the form proposed by the defendants that permits Stephan Hess to be employed by Tyrolit North America, Inc., except in the following areas:
1. Stephan Hess shall not engage in or contribute his knowledge to research, development of new products, applications, technologies (including bonds, fillers, pore inducers and abrasives), testing, or customer support in the areas of vitrified abrasives and super-abrasives;
2. Stephan Hess shall not solicit business from customers which he solicited while employed at Norton Company, and shall not solicit business from manufacturers of automotive products, bearing products or aircraft engine components;
3. Stephan Hess shall not engage in or contribute his knowledge to any products, processes, developments or applications that deal with mounted point grinding wheels, centerless grinding wheel products, and “Norton-shaped” abrasives;
4. The above prohibitions shall expire on January 16, 2002.

 Hess had been employed by Norton Company since 1991.

 There is some evidence that the defendant Hess worked on some limited field tests and tasks in core technologies (that apparently arch across both vitrified and organic abrasives) for very limited times; to the extent that he did, he submits a willingness to be subject to an injunction. On these occasions, his exposure to the organics branch of the abrasives business is found to be negligible.

 Evidence was introduced that Norton Company, effective November 1, 1997, instituted a policy requiring such an agreement (non-compete) upon new hires and promotions in sensitive areas.