van Gestel, Allan, J.
This matter comes before the Court on a request by the plaintiffs North American Expositions Company Limited Partnership, and its general partners (collectively, “NAMEC”), seeking a preliminary injunction enjoining the defendants who, for these purposes, collectively and in various capacities, own and operate the Bayside Expo Center, Inc. (collectively, “Bayside”), from “further interfering with [NAMEC’s] efforts to produce its shows at the Boston Convention and Exhibition Center” (the “BCEC”). In considering the request, the Court must keep in mind the teachings in Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980), particularly as they relate to likelihood of success on the merits, irreparable harm and a balancing of the equities. See also, GTE Products Corp. v. Stewart, 414 Mass. 721, 722-23 (1993), and The Modern Continental Construction Co. v. City of Lowell, 391 Mass. 829, 837 (1984).
Further, this is one of those cases in which the risk of harm to the public interest may also have to be considered. See Commonwealth v. MassCRINC, 392 Mass. 79, 87 (1984); Brookline v. Goldstein, 388 Mass. 443, 447 (1983). See, also, Boston Harbor Commuter Service v. MBTA, Suffolk Super.Ct., Civil Action No. 97-3392 (June 30, 1999).
While proceeding through the Packaging Industries analysis, the Court also must determine whether there is sufficient procedural support to grant the relief sought. “Evidence that goes beyond the unverified allegations of the pleadings and motion papers must be presented to support or oppose a motion for a preliminaiy injunction.” Planned Parenthood League of Massachusetts, Inc. v. Operation Rescue, 406 Mass. 701, 713 (1990); Goldstein, supra, 388 Mass, at 450 n.10.
In this whole process, the burden of persuasion rests on NAMEC as the moving parly. See, e.g., GTE Products Corp., supra, 414 Mass, at 722-23.

BACKGROUND

The background for this decision is taken principally from NAMEC’s complaint, although supplemented where appropriate from the affidavits and documents filed by both NAMEC and Bayside.
NAMEC is a local business that produces and operates annual trade and public shows.
Included among those shows are the New England Boat Show (the “Boat Show”), the New England Camping and Recreational Vehicle Show (the “Camping & RV Show”) and the North American Home Show (the “Home Show”). For many years these shows have been produced at the Bayside Expo Center.
There has been a falling out between NAMEC and Bayside. Litigation resulted in 2001 before this Court. See North American Expositions Company, LP v. Hub Expo Management, LLC, Suffolk Civil Action No. 01-3837 BLS. That litigation was settled before trial. Among other things, the settlement granted NAMEC licenses for the Boat Show and the Camping & RV Show at the Bayside Expo Center through the 2006 season. Licenses for three other NAMEC shows were extended through 2003.
Bayside has declined to extend any of the NAMEC licenses beyond the 2007 season. NAMEC, therefore, is looking for a new venue for the Boat Show and the Camping & RV Show. In that effort NAMEC has been in contact with the new BCEC.
As noted above, NAMEC contends that Bayside is interfering with NAMEC’s efforts to get its shows into the BCEC. Before getting to the nature of the alleged interference, an understanding of the legislation relating to the establishment of the BCEC warrants discussion.
Unfortunately, like much of the matters involved in the geographic area wherein the BCEC has now been constructed, political efforts to extract monies resulting from the use of the BCEC for the benefit of the *546 community asserted to be most impacted — said to be South Boston — have complicated matters. What is presented here is a demonstration of some of those complications.
Chapter 152 of the Acts of 1997 (“Chapter 152”) is the legislative enactment facilitating the construction and financing of, among others, the Boston Convention and Exhibition Center. The political interplay among the South Boston community and the entities involved is revealed within the legislation.
Sec. 1 of Chapter 152 sets forth in a preamble elaborate legislative findings describing the need for and effects of, among other things, the construction and operation of the BCEC. Two sentences set the tone:
It is hereby found and declared that the development of convention and exhibition centers of sufficient size and having adequate facilities to attract and accommodate large national and international groups who wish to conduct conventions, exhibitions and other similar events within the commonwealth is beneficial to the economic development of the commonwealth and the general welfare of its citizens ... It is further found and declared that by attracting nonresident visitors to the commonwealth through the development of a suitable convention and exhibition center, it is expected that substantial economic development will be stimulated in such tourism-related industries as transportation, hotels, restaurants, recreation, entertainment and retail establishments.
What is contemplated are conventions and exhibitions that will draw out of state and international visitors to Boston, with such attendant economic benefits, both public and private, that flow therefrom.
By other sections of Chapter 152 it is also clear that there is an expressed legislative intent not to harm local exhibition halls, particularly in Boston, including, by name, the Hynes Convention Center, the World Trade Center and the Bayside Exposition Center.
Section 15(d) of Chapter 152 is one sentence long, reading: “Notwithstanding any provision of this act to the contrary, the project, as defined in section 2, shall not be marketed or utilized for so-called gate shows or other similar consumer shows.” The “project,” defined in sec. 2 is, although more elaborately set forth therein, basically “the planning, design, acquisition, development, construction, expansion, rehabilitation, improvement, furnishing, equipping and finishing or any combination of the foregoing, and the operation, promotion and maintenance, of’ the BCEC.
The parties agree that a “gate show,” as prohibited in sec. 15(d), is not a convention but rather a show— like the Boat Show and the Camping & RV Show — that attracts local attendees who come by automobile or public transportation, pay an entry fee, and enjoy the show for a few hours and go home. A gate show is quite different from a national or international convention that draws people to the city for days or weeks at a time, thereby utilizing the tourism-related industries such as transportation, hotels, restaurants, recreation, entertainment and retail establishments featured in the findings in sec. 1.
Near the end of debate on the legislation, an amendment to Chapter 152 was inserted on the Senate floor. The amendment language appears in section 4, subsections (g)(1) through (g)(v). Because of its significance to the arguments made here, the Court quotes the entirety of sec. 4, subsection (g).
(g)(1) As used in this subsection, the following terms shall, unless otherwise required, have the following meanings:
The South Boston Community Development Foundation or foundation shall consist of a committee of nine members: three members appointed by the governor who shall be business owners from the locally impacted neighborhood; three members appointed by the mayor who shall be representatives of social service agencies; the senator from the first Suffolk district or his designee, who shall be a non-voting member; the representative from the fourth Suffolk district or his designee, who shall be a non-voting member; and the Boston city councilor from District 2 or his designee; all of whom, with the exception of the elected officials, shall be residents of South Boston and shall serve a two-year term which may be extended by reappointment.
The Community Development Fund shall consist of monies held in a Massachusetts Charitable Trust, to be placed in a money market interest-bearing account to be administered by the South Boston Community Development Foundation.
(ii) Notwithstanding the prohibition against gate shows in subsection (d) of section 15, in consideration of the project’s impact, the [Massachusetts Convention Center] Authority shall allow the South Boston Community Development Foundation to sponsor no less than three charitable events annually at the Boston Convention and Exhibition Center, and shall include access to on-site parking facilities. Said events shall be scheduled mutually by the Authority and the foundation so as not to conflict or interfere with the regular operation of the Boston convention and exhibition center. Said community events shall not compete with the Boston exhibition and convention center and shall not solicit any event previously hosted by the Hynes convention center, the World Trade Center or the Bayside Exhibition Center in the ten-year period before the effective date of this act, without the consent of the affected facility. Said events shall be sponsored by the foundation for the purposes set forth in this subsection; provided, further, that the net proceeds of said events shall not be used for any purpose other than those described in this subsec *547 tion. The Authority shall deposit said proceeds, including but not limited to, on-site parking fees in the Community Development Fund.
(iii) The South Boston Community Development Fund shall consist of the net proceeds and fees generated by the three charitable events described in paragraph (ii) in addition to any other contributions that may be deposited in said fund from time to time.
(iv) The South Boston Community Development Foundation shall dispense funds, from time to time, from the Community Development Fund for the benefit of the South Boston residential, charitable and business communities which may be adversely impacted by the project.
(v) The foundation shall file a detailed report of its income and expenditures, on or before October 1 of each year, with the secretary of administration and finance and the house and senate committees on ways and means.
As a result of learning that Bayside will not do business with it in the future, NAMEC contacted the South Boston Community Development Foundation (the “Foundation”) and requested its sponsorship of the Boat Show and the Camping & RV Show. The Foundation is said to have responded with interest.
It is alleged by NAMEC that Bayside, on learning of NAMEC’s entreaties to the Foundation, commenced interfering with the relationship. It is alleged by NAMEC — and denied by Bayside — that Bayside has threatened suit against the Foundation if it sponsors the Boat Show or the Camping & RV Show. Further, it is alleged that Bayside has asserted to the Foundation that Bayside, under Chapter 152, has “veto” power over the movement of the Boat Show and the Camping & RV Show to the BCEC. Apparently, the Foundation has become skittish because of the alleged threats.
NAMEC further asserts that it needs to contract now to secure space at the BCEC for the 2007 season because it takes that long to plan for its shows.
The foregoing background facts provide some, but not all, of the cantankerous positions of the litigants. They are, however, at this time sufficient for the Court to act, and explain its action, on the request for preliminaiy injunctive relief.

DISCUSSION

As inferred above, the phrasing and syntax of sections of Chapter 152 that are in issue leave much to be desired by a Court that is asked to interpret or enforce them.
Section 15(d) prohibits the marketing or utilizing of the BCEC for gate shows. NAMEC’s Boat Show and Camping & RV Show are gate shows. Thus, if that were all there was to consider, no injunction would be warranted. However, section 4(g)(ii), and related subsections significantly cloud the picture.
Subsection (g)(ii) applies “notwithstanding the prohibition against gate shows in subsection (d) of section 15 . . .” This subsection (g)(ii) mandates that the Convention Center Authority “shall allow” the Foundation “to sponsor no less than three charitable events annually at the” BCEC. This would seem to mean that the Foundation may sponsor three or more charitable events every year at the BCEC and the Authority must allow the Foundation to do so. But subsection (g)(iii) speaks of “the three charitable events,” thereby implying that subsection (g) (ii) may not really mean “no less than three events” but instead may mean three; or possibly “less” should be read as “more” and the subsection really is intended to mean “no more than three events.” Whatever this subsection should mean is for the Legislature, not this Court, to make clear.
Here, in any event, this Court is not being asked to rule on what the correct number of charitable events to be sponsored by the Foundation is in the years that NAMEC is seeking to produce its two shows. Consequently, the Court will proceed through the fog of the legislative language in an effort to determine what the rest of it means.
Subsection (g)(ii) references a prohibition of gate shows, but never mentions gate shows again. Rather, it speaks of “charitable events.” Nowhere in Chapter 152, however, is the phrase “charitable events” defined. The New World Dictionary (2nd Ed.) defines “charitable” as: “kind and generous in giving money or other help to those in need; of or for charily; kind and forgiving in judging others; lenient.” The Court presumes the second definition applies here — of or for charity. Thus, the statute permits the Foundation to sponsor at least three events of or for charity.
Later in sec. (g)(ii) the word “charitable” becomes or is replaced by the word “community.” While the two words clearly are different, this Court will not presume that the legislature meant anything different by calling the events “community” rather than “charitable.” Again, if this Court incorrectly reads the legislative intent, it is up to the Legislature to make its meaning clear.
The events permitted “shall not compete with the Boston exhibition and convention center [which presumably is the same entity as the Boston Convention and Exhibition Center] and shall not solicit any event previously hosted by the Hynes convention center, the World Trade Center or the Bayside Exhibition Center in the ten-year period before the effective date of this act, without the consent of the affected facility.” This phrasing is, like others, not wholly clear. It speaks of the community events not competing and not soliciting. Does an event compete or solicit? Or, more probably, is it an entity — here the Foundation — that competes or solicits? Further, the Foundation is only *548 supposed to be a sponsor of an event, not the operator or producer. Can a sponsor compete or solicit?
The foregoing points out the difficulties for a Court in determining whether, in any way, it ultimately can rule that Bayside interfered with NAMEC’s advantageous relationship with the Foundation when Bayside objected — and threatened suit, assuming it did — to the Foundation sponsoring a competitive gate show run by NAMEC. In this legislative thicket can Bayside refuse to consent to the Foundation’s sponsorship of the Boat Show and the Camping & RV Show? It clearly appears that it can. And if the Foundation proceeds with the sponsorship over Bayside’s refusal to consent, can Bayside sue to enforce its rights? Again, it clearly can. The foregoing being so, Bayside’s threatening to sue the Foundation if it defies the lack of consent cannot be deemed a tortious interference with NAMEC’s relationship with the Foundation.
At this early stage of this case, therefore, this Court cannot conclude that NAMEC has shown the requisite likelihood of success on the merits in its claim that Bayside, by refusing to consent to NAMEC’s prpposed shows at the BCEC with Foundation sponsorship, improperly interfered with any advantageous relationship that NAMEC has with the Foundation. Nor is it at all clear that the threat of a lawsuit by Bayside against the Foundation is actionable.
Additionally, it is not readily apparent that there is harm on the horizon that cannot be cured by monetary damages. NAMEC has had substantial advance notice that it would need a new venue for the Boat Show and the Camping & RV Show. It should not be down to the last minute in that hunt. Further, given the long history in NAMEC’s running of these two shows, it must have substantial evidence of the anticipated profits it will lose if it fails in its hunt for 2007, and has a source for recovery if it can pin the blame for that failure on Bayside.
The Court is aware that during the 2004 budget debate there was a legislative attempt to amend Chapter 152, sec. 15(d) which would clarify its language to permit gate shows at the BCEC utilizing more than three hundred thousand feet. Amendment 603. This proposal, however, was defeated by a voice vote.
Once again, in 2005, there is another, somewhat different, proposal to amend Chapter 152, sec. 15(g). This more recent proposal would permit a gate show at the BCEC if such a show had been produced at a private facilify that now refuses to renew an agreement to do so. See House #2834. So far as this Court is aware, this proposed legislation has not come up for a vote.
There is a need for a clarifying amendment to Chapter 152, particularly the language and interplay between secs. 4(g) and 15. What those amendments should say is not for this Court to suggest. The Court does, however, hope that there can be some clarification and guidance for those who are asked to interpret and enforce the law. The public interest requires it.

ORDER

The plaintiffs’ request for a preliminary injunction is DENIED. This ruling, however, should not be taken by the parties as establishing the law of this case or as prohibiting the plaintiffs from seeking similar relief after some discovery or additional evidence is had or found that warrants such relief.
Further, this Order is not meant to prevent NAMEC from proceeding under Mass.R.Civ.R Rule 56, consistent with Superior Court Rule 9A, at any time. The Court, however, declines to expedite that process and make it move faster than Rule 9A requires. Nor is the Court hereby making any anticipatory ruling on any Rule 56(f) request by Bayside in response to any Rule 56 motion served by NAMEC.