van Gestel, Allan, J.
This matter comes before the Court on a special motion to dismiss under G.L.c. 231, sec. 59H, Paper #22, by the defendants, who for these purposes, collectively and in various capacities, own and operate the Bayside Expo Center, Inc., (collectively, “Bayside”), against the plaintiffs North American Expositions Company, Limited Partnership, and its general partners, (collectively, “NAMEC”).*

BACKGROUND

The background for this decision is taken principally from NAMEC’s verified complaint.
NAMEC is a local business that produces and operates annual trade and public shows. Included among those shows are the New England Boat Show (the “Boat Show”), the New England Camping and Recreational Vehicle Show (the “Camping & RV Show”) and the North American Home Show (the “Home Show”). For many years these shows have been produced at the Bayside Expo Center.
There was a falling out between NAMEC and Bayside. Litigation resulted in 2001 before this Court. See North American Expositions Company, LP v. Hub Expo Management, LLC, Suffolk Civil Action No. 01-3837 BLS. That litigation was settled before trial. Among other things, the settlement granted NAMEC licenses for the Boat Show and the Camping & RV Show at the Bayside Expo Center through the 2006 season. Licenses for three other NAMEC shows were extended through 2003.
Bayside has declined to extend any of the NAMEC licenses beyond the 2007 season.
NAMEC, therefore, is looking for a new venue for the Boat Show and the Camping & RV Show.
In that effort NAMEC has been in contact with the Boston Convention and Exhibition Center (“BCEC”).
NAMEC charges Bayside with interfering with NAMEC’s efforts to get its shows into the BCEC. A general understanding of the legislation relating to the establishment of the BCEC is necessary. Political matters abound.
Chapter 152 of the Acts of 1997 (“Chapter 152”) is the legislative enactment facilitating the construction and financing of the BCEC. The political interplay among the South Boston community and the entities involved is apparent in the legislation.
Sec. 1 of Chapter 152 sets forth in a preamble elaborate legislative findings describing the need for and effects of, among other things, the construction and operation of the BCEC. Two sentences set the tone:
It is hereby found and declared that the development of convention and exhibition centers of sufficient size and having adequate facilities to attract and accommodate large national and international groups who wish to conduct conventions, exhibitions and other similar events within the commonwealth is beneficial to the economic development of the commonwealth and the general welfare of its citizens ... It is further found and declared that by attracting nonresident visitors to the commonwealth through the development of a suitable convention and exhibition center, it is expected that substantial economic development will be stimulated in such tourism-related industries as transportation, hotels, restaurants, recreation, entertainment and retail establishments.
What is contemplated are conventions and exhibitions that will draw out-of-state and international visitors to Boston, with such attendant economic benefits, both public and private, that flow therefrom.
By other sections of Chapter 152 it is also clear that there is an expressed legislative intent not to harm *190 presently existing local exhibition halls, including, by name, the Bayside Exposition Center.
Section 15(d) of Chapter 152 is one sentence long: “Notwithstanding any provision of this act to the contrary, the project, as defined in section 2, shall not be marketed or utilized for so-called gate shows or other similar consumer shows.” The “project,” defined in sec. 2, is basically “the planning, design, acquisition, development, construction, expansion, rehabilitation, improvement, furnishing, equipping and finishing or any combination of the foregoing, and the operation, promotion and maintenance, of’ the BCEC.
A “gate show,” as prohibited in sec. 15(d), is not a convention but rather a show — like the Boat Show and the Camping & RV Show — that attracts local attendees who come by automobile or public transportation, pay an entry fee, and enjoy the show for a few hours and go home. A gate show is quite different from a national or international convention that draws people to the city for days or weeks at a time, thereby utilizing the tourism-related industries such as transportation, hotels, restaurants, recreation, entertainment and retail establishments featured in the findings in sec. 1.
Near the end of debate on the legislation, an amendment to Chapter 152 was inserted on the Senate floor. The amendment language appears in section 4, subsections (g)(i) through (g)(v), and reads as follows:
(g)(i) As used in this subsection, the following terms shall, unless otherwise required, have the following meanings:
The South Boston Community Development Foundation or foundation shall consist of a committee of nine members: three members appointed by the governor who shall be business owners from the locally impacted neighborhood; three members appointed by the mayor who shall be representatives of social service agencies; the senator from the first Suffolk district or his designee, who shall be a non-voting member; the representative from the fourth Suffolk district or his designee, who shall be a non-voting member; and the Boston city councilor from District 2 or his designee; all of whom, with the exception of the elected officials, shall be residents of South Boston and shall serve a two year term which may be extended by reappointment.
The Community Development Fund shall consist of monies held in a Massachusetts Charitable Trust, to be placed in a money market interest-bearing account to be administered by the South Boston Community Development Foundation.
(ii)Notwithstanding the prohibition against gate shows in subsection (d) of section 15, in consideration of the project’s impact, the [Massachusetts Convention Centerl Authority shall allow the South Boston Community Development Foundation to sponsor no less than three charitable events annually at the Boston Convention and Exhibition Center, and shall include access to on site parking facilities. Said events shall be scheduled mutually by the Authority and the foundation so as not to conflict or interfere with the regular operation of the Boston convention and exhibition center. Said community events shall not compete with the Boston exhibition and convention center and shall not solicit any event previously hosted by the Hynes convention center, the World Trade Center or the Bayside Exhibition Center in the ten-year period before the effective date of this act, without the consent of the affected facility. Said events shall be sponsored by the foundation for the purposes set forth in this subsection; provided, further, that the net proceeds of said events shall not be used for any purpose other than those described in this subsection. The Authority shall deposit said proceeds, including but not limited to, on site parking fees in the Community Development Fund.
(iii) The South Boston Community Development Fund shall consist of the net proceeds and fees generated by the three charitable events described in paragraph (ii) in addition to any other contributions that may be deposited in said fund from time to time.
(iv) The South Boston Community Development Foundation shall dispense funds, from time to time, from the Community Development Fund for the benefit of the South Boston residential, charitable and business communities which may be adversely impacted by the project.
(v) The foundation shall file a detailed report of its income and expenditures, on or before October 1 of each year, with the secretary of administration and finance and the house and senate committees on ways and means.
As a result of learning that Bayside will not do business with it in the future, NAMEC contacted the South Boston Community Development Foundation (the “Foundation”) and requested its sponsorship of the Boat Show and the Camping & RV Show. The Foundation is said to have responded with interest.
It is alleged by NAMEC in its complaint[3] that Bayside, on learning of NAMEC’s entreaties to the Foundation, commenced interfering with the relationship. NAMEC charges — and Bayside denies — that Bayside has threatened litigation against the Foundation if it sponsors the Boat Show or the Camping & RV Show. Further, it is alleged that Bayside has asserted to the Foundation that Bayside, under Chapter 152, has “veto” power over the movement of the Boat Show and the Camping & RV Show to the BCEC.
NAMEC further asserts that it needs to contract now to secure space at the BCEC for the 2007 season because it takes that long to plan for its shows.
Both NAMEC and Bayside have been unabashedly political in their actions. NAMEC has sought legisla *191 tion, which appears pointed directly at Bayside, which would prevent Bayside from complaining about or stopping NAMEC from presenting the Boat Show and the Camping & RV Show at the BCEC. With equal political vigor, Bayside has aggressively touted its position before the Legislature, the BCEC, the South Boston Community Development Foundation and, perhaps, elsewhere.
The proposed amended complaint contains six counts: Count I for injunctive relief; Count II for a declaratory judgment; Count III for tortious interference with a prospective business advantage; Count IV for tortious interference with contractual relations; Count V for breach of the implied covenant of good faith and fair dealing; and Count VI for violation of G.L.c. 93A, sec. 11. This proposed amended complaint “seeks to assert claims based intentional interference . . . with [NAMEC’s] contractual relationship with its sponsor.”

DISCUSSION

G.L.c. 231, sec. 59H is intended to provide a mechanism to resolve quickly lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. Duracraft Corp. v. Holmes Products Corp., 427 Mass. 156, 161 (1998).
Massachusetts courts have applied a broad construction to the phrase “petitioning activities.” See, e.g., Office One, Inc. v. Lopez, 437 Mass. 113 (2002); Baker v. Parsons, 434 Mass. 543 (2001); McLarnon v. Jokischi, 431 Mass. 343 (2000); Plante v. Wylie, 63 Mass.App.Ct. 151 (2005); MacDonald v. Paton, 57 Mass.App.Ct. 290 (2003).
There is a burden shifting framework that applies under G.L.c. 231, sec. 59H. See Duracraft, supra, 427 Mass, at 167-68. The movant must make a threshold showing that the claims it seeks to dismiss are based on its petitioning activities alone and have no substantial basis other than or in addition to those petitioning activities. If that burden is met, the burden shifts to the non-moving party to show, by a preponderance of the evidence, that the moving party’s exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in law and that the moving party’s acts caused actual injury to the responding party. Baker, supra, 434 Mass. at 553-54. See also Office One, Inc., supra, 437 Mass. at 124.
Here, it seems clear that Bayside, acting through its officers, was petitioning when it communicated with the Foundation and the Legislature and that NAMEC’s claims in the unamended complaint are based on those activities alone. Lobbying the Legislature, of course, is clearly the kind of petitioning that is protected. The question for this Court is whether the Foundation also falls within the ambit of the “legislative, judicial, and administrative bodies and other public fora” that are essential to the democratic process targeted by the anti-SLAIPP statute. Duracraft, supra, 427 Mass. at 161.
As recited above, the Foundation is a creature of the statute enabling the construction and management of the BCEC. Chapter 152, sec. 4, subsec. (g)(1), is repeated here:
(g)(i) As used in this subsection, the following terms shall, unless otherwise required have the following meanings:
The South Boston Community Development Foundation or foundation shall consist of a committee of nine members: three members appointed by the governor who shall be business owners from the locally impacted neighborhood; three members appointed by the mayor who shall be representatives of social service agencies; the senator from the first Suffolk district or his designee, who shall be a non-voting member; the representative from the fourth Suffolk district or his designee, who shall be a non-voting member; and the Boston city councilor from District 2 or his designee; all of whom, with the exception of the elected officials, shall be residents of South Boston and shall serve a two-year term which may be extended by reappointment.
Given the intent behind the anti-SLAPP statute, if “statements made by one participant in a pending governmental proceeding in an effort to settle the controversy,” Plante, supra, 63 Mass.App.Ct. at 159, and a “Web site [conceived] as a forum for speech by citizens about issues of public and political concern in Athol,” MacDonald, surpa, 57 Mass.App.Ct. at 295, can be found within the protection afforded, then surely comments to the Foundation about its authority under Chapter 152 must be protected as well.
Thus, the burden shifts to NAMEC to show, by a preponderance of the evidence that Bayside’s exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in law and that Bayside’s acts caused actual injury to NAMEC.
“It is not enough for [NAMEC] to show that [Bayside’s) alleged petitioning activity . . . was based on an error of law; [NAMEC] must show that no reasonable person could conclude that there was a basis in law for [the petitioning activities].” Baker, supra, 434 Mass. at 555. It has failed to do so in this case.
Lastly, there is a question as to whether the fact that NAMEC seeks, among other things, a declaratory judgment removes it from the protection of the antiSLAPP statute. Because the focus is not on the nature of the claims, but rather on the petitioning activities, Duracraft, supra, 427 Mass. at 165, the fact that declaratory relief is sought is not significant.

ORDER

For the foregoing reasons, the Defendants’ Special Motion to Dismiss Under G.L.c. 231, Sec. 59H, Paper #22, is ALLOWED, and the defendants “shall [be] *192 award[ed]... the costs and reasonable attorneys fees” as mandated by sec. 59H.

 Editor’s Note; For an earlier opinion denying the plaintiffs motion for a preliminary injunction in this matter, see 19 Mass. L. Rptr. 545 (van Gestel, J.).

 Recently, after the service of the present motion to dismiss, NAMEC moved to amend its complaint. The Court has reviewed the proposed amended complaint and has considered the claims therein in connection with this motion. It declines to allow the amendment.